[Civil No. 2934. Filed December 15, 1930.]

[294 Pac. 280.]

KATHERINE V. MacRAE, Appellant, v. THOMAS MacRAE, Appellee.

Messrs. Moore, Elliott & Shimmell, for Appellant.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld and Messrs. Swenson & Swenson, for Appellee.

LOCKWOOD, C. J.—This is an appeal from a judgment of the superior court of Pinal county holding that Thomas MacRae, hereinafter called defendant, is the owner as his sole and separate property of certain lands described in the pleadings, as against John H. Betts, Jr., and Edna Betts, his wife, and Katherine V. MacRae, which latter we shall hereinafter call plaintiff, and that they have no title or interest in the premises, and directing that Betts and his wife, the holders of the legal title to the property at the beginning of the action, execute a deed conveying it to defendant. The Betts filed a disclaimer in the action, alleging that they held merely the legal title in trust, and were willing to convey the land to either plaintiff or defendant, in accordance with the judgment of the court. The real issue which was determined by the trial court, and which is before us on review, is whether the conveyance should be made to defendant or to plaintiff.

We desire to preface our consideration of the case by complimenting counsel for both plaintiff and defendant upon the very able, clear and complete manner in which they have briefed it. The issues were presented as directed by the rules of the court, and each legal proposition raised was lucidly discussed and the authorities exhaustively cited and analyzed. While there is considerable conflict on certain phases of the testimony, yet the facts necessary for our determination of the case are so conclusively established, either by the undisputed evidence, the admis-

sions of the parties, or the findings of the trial court, that we state them as follows:

In 1917, defendant, then being a single man, filed on the land in question as a desert entry under the land laws of the United States, and thereafter caused the work required by law to be performed and payments for the land to be made in such manner that, when final certificate was issued to him in May, 1921, it was unquestionably his sole and separate property. Shortly thereafter defendant and plaintiff together executed a deed to said land in favor of plaintiff, the deed reciting that it was to be hers as separate, and not as community, property, which deed was duly recorded. Thereafter, in September, 1922, plaintiff and defendant jointly deeded the property to Betts, which deed was also recorded.

The reason for the first conveyance, as given by defendant, was that in 1921 he had engaged in a certain business deal in Texas with W. W. Vaughn, plaintiff's brother, and that thereafter he had been informed by Vaughn that the latter was heavily involved financially. Later he (MacRae) was told by his lawyer in Fort Worth, Texas, that there was danger under the laws of Texas that he had, by virtue of his actions, become a constructive partner of Vaughn's, and might be liable for the latter's debts. He and his wife discussed the matter, and she suggested that the property be protected against any liability for such debts by being placed in the hands of someone as trustee. He thought over the matter for some months, and finally decided to turn the property over to his secretary, a Mrs. Stewart, as trustee. When defendant informed plaintiff of his intention to that effect, she advised him that, if he was going to deed it to another, it might as well be her, since she would be with him in case it was necessary to transfer it quickly to anyone else. He therefore accepted the suggestion and executed deeds con-

veying the land to plaintiff, for the express purpose of avoiding any possible liability on account of his transactions with Vaughn in Texas. It also appears from defendant's testimony that a suit was actually commenced against him and Vaughn in Texas, arising out of the transactions above referred to, and that he filed an answer denying any liability therein.

The transfer from plaintiff to Betts was made on account of a certain lawsuit brought against defendant in the superior court of Pinal county. He had entered into negotiations with a Dr. Crump for the improvement of the property, and, fearing that the Arizona suit mentioned above might affect the deal, caused plaintiff to transfer the land to Betts to avoid its being tied up by attachment or otherwise. Judgment was later rendered against him in the suit for a much smaller sum than the amount claimed, which judgment he promptly settled.

We may also take the evidence as sufficient to support the finding of the trial court to the effect that plaintiff, at the time defendant conveyed the property to her, promised to reconvey it to him on demand, and that as a matter of fact there was no actual liability on his part on account of the Texas transactions with Vaughn, and his apprehensions thereon were unfounded. If any other facts appear to be material for the purposes of the opinion, they will be stated later in the proper connection.

The first question of law which arises is whether or not an express oral trust, such as defendant alleges to have existed between himself and plaintiff through her promise to reconvey the land to him on demand, can be proved by parol, since it is admitted there is no written evidence of such agreement and it is denied by plaintiff. Both plaintiff and defendant have favored us with an exhaustive review of the authorities upon this point. This court considered the question in the cases of *Scribner* v. *Meade,* 10

Ariz. 143, 85 Pac. 477, *Wright* v. *Young,* 20 Ariz. 46, 176 Pac. 583, and *Cashion* v. *Bank of Arizona,* 30 Ariz. 172, 245 Pac. 360.

In the case last cited we held specifically that, while an express oral trust might be created, it could not be proved except by writing stating the terms and conditions of the trust. We have reconsidered the matter and read the cases cited by counsel for plaintiff and defendant bearing thereon, and, regardless of what may be the situation in other states, we are satisfied with the rule adopted by us in the case last cited, and reiterate its holding. Defendant MacRae, therefore, could not recover on the theory of an express trust.

It is claimed by defendant, however, that, even though this be true, he may nevertheless recover on the theory of a constructive trust, on his allegations in his amended answer "that although said deeds were absolute in form as aforesaid and although said deeds recite a consideration yet in truth and in fact there was no consideration therefor and no money was paid or intended to be paid as a consideration for said deeds and said deeds were made by the grantors therein named and accepted by the grantee therein named in trust and for the purpose and with the intent that said Katherine V. MacRae should merely hold the naked title to said real property and upon her agreement to reconvey the legal title to said property to this defendant or to his order upon demand by this defendant; that this defendant had at all times confidence in his said wife and her devotion and fidelity to him and that he made the deeds having confidence in his said wife and her representations and promises and relying on the same."

A constructive trust is one which does not arise by agreement or from the intention of the parties, but by operation of law, and fraud, actual or constructive, is an essential element thereto. Actual

fraud is not always necessary, but such a trust will arise whenever the circumstances under which the property was acquired make it inequitable that it should be retained by the one who holds the legal title. These trusts are also known as trusts *ex maleficio* or trusts *ex delicto*. Their forms and varieties are practically without limit, as they are raised by courts of equity whenever it becomes necessary under the particular circumstances of the case to prevent a failure of justice, but the element of fraud, either actual or implied, must always be present.

It is urged by defendant that the facts in the case at bar show a constructive trust for two reasons: First, because of the breach of the oral agreement to reconvey found by the court, and, second, because the transaction was between persons in a fiduciary or confidential relation. The mere violation of a parol promise made by the grantee to the grantor to hold the land in trust and to reconvey it on demand does not create a constructive trust in the grantee, in the absence of fraud in procuring the conveyance. *Kemp* v. *Kemp,* 248 Mass. 354, 142 N. E. 779; *Moseley* v. *Moseley,* 86 Ala. 289, 5 South. 732; *Davis* v. *Stambaugh,* 163 Ill. 557, 45 N. E. 170; *Parrish* v. *Parrish,* 33 Or. 486, 54 Pac. 352.

There is nothing in the evidence to justify a holding that plaintiff did anything as preliminary to or in connection with the conveyance in question fraudulent in its nature, and, were she a stranger to defendant, no constructive trust could be sustained. But it is urged that when confidential relations exist between two parties, the rule is different, and, even though no active fraud by the grantee in the procuring of a conveyance be shown, the mere existence of the confidential relation, *when coupled with a promise to reconvey,* creates a constructive trust.

The cases on this point are not in entire harmony. We are of the opinion, however, that the better rule

is that contended for by defendant. The relationship of husband and wife is confidential in the highest degree. It is presumed by the law that they act with one another in absolute confidence, that each will be faithful to the other's interests, and that they need not take the precautions in dealing with each other that are customary between strangers. If it were required that in their mutual relations they must deal with each other at arms' length, the marital status would become intolerable. As is well said in *Brison* v. *Brison,* 90 Cal. 323, 27 Pac. 186, 190:

"The influence which the law presumes to have been exercised by one spouse over the other is not an influence caused by any act of persuasion or importunity but is that influence which is superinduced by the relation between them, and generated in the mind of the one by the confiding trust which he has in the devotion and fidelity of the other. Such influence the law presumes to have been undue, whenever this confidence is subsequently violated or abused."

It is claimed by plaintiff the complaint does not set up a constructive trust. It is true that perhaps its language might have been more definite, but we think that, fairly construed, it does allege facts from which a constructive trust is implied.

But, plaintiff answers, even though we hold the pleadings and the evidence sustain a finding that a constructive trust to reconvey exists, nevertheless it will not be enforced by a court of equity because of the fraudulent purpose of the two conveyances in question. This brings us to the most difficult question in the case.

Briefly speaking, it is the position of plaintiff that, taking defendant's testimony as conclusive upon him, he has out of his own mouth shown that he does not come into a court of equity with clean hands, and is therefore entitled to no relief therefrom. That his own statements are conclusive to the effect that he

transferred, or caused to be transferred, the property in both instances involved in an endeavor to defraud creditors, is established beyond dispute. By his own solemn admissions under oath, made repeatedly during the trial, he has bound himself as to the existence of such a state of facts as would compel any fair-minded court to find that the transfers in question were made in an attempt to violate our statute regarding fraudulent conveyances. *Arizona State Bank* v. *Crystal Ice etc. Co.*, 26 Ariz. 82, 222 Pac. 407, 409. Indeed, this is not seriously questioned by counsel for defendant in their brief. They claim, however, that, as it does not appear that any liability on the part of defendant actually existed, and that his fears were imaginary, the transactions were not fraudulent, and the admitted rule that equity will not intervene to set aside at the request of a grantor a conveyance made in fraud of creditors does not apply.

On this point there is a sharp conflict of authorities, and counsel, in a commendable zeal to assist the court in a correct determination, have apparently collated and discussed every case bearing even remotely on the point at issue. Plaintiff claims her contention is supported by the decisions of the courts of last resort in the states of New Jersey, Ohio, Kentucky, Virginia, Texas and in the District of Columbia. Defendant admits that, with the exception of Texas, the rule in the jurisdictions mentioned by plaintiff is as stated by her, but contends the overwhelming weight of reason and authority sustains his view, and cites in support thereof decisions from the appellate courts of Iowa, Michigan, North Carolina, Mississippi, West Virginia, Kansas, New York, Washington, Connecticut, Oklahoma, California, Texas and New Mexico. We have examined and compared with great care every decision on this point cited by either

counsel, and, if the mere number of jurisdictions and cases which support the respective rules contended for is determinative of the issue, defendant must prevail. In questions of law, however, as well as of fact, it is not necessarily the number, but rather the quality, of the authorities which counts. As was well stated by Lord Macaulay, in discussing this very point: "The single witness may be Tillotson or Ken; the two may be Oates and Bedloe." Let us, then, consider the reasoning in support of the respective rules.

The case which best states the reason for the rule contended for by defendant is that of *Day* v. *Lown,* 51 Iowa 364, 1 N. W. 786, 790. Therein the court says:

"The sole object of the statute is to prevent conveyances of property with intent to defraud creditors, purchasers, or other persons. If there were no creditors or purchasers, the conveyance could not be fraudulent as to them. The words 'other persons' must be construed to mean some one who had or might have a claim or right to the property conveyed which might be enforced at law or equity. Subject thereto the right of the plaintiff to dispose of his property as he saw proper, was absolute and unconditioned. His intent in so doing was wholly immaterial, provided no one but himself was injured or had cause to complain. The statute must have a practical and legal application. *It was not the intent the statute should be regarded in the light of a moral code, and operate on the conscience of the party making the conveyance.* But its purpose is to protect the legal or equitable rights of others." (Italics ours.)

In other words, the test of whether a man comes into a court of equity with clean hands, which is admittedly the basis for the exercise of its jurisdiction in such cases, is not the intention of the party, but whether his intended fraud actually succeeded in harming another.

The reason for the other rule is well stated in *Pride* v. *Andrew,* 51 Ohio St. 405, 38 N. E. 84, 88, wherein the following language appears:

"Courts of law are the effective agencies by which creditors secure their rights, and it is to be presumed that their judgments and decrees will be founded on justice. If the grantor of property, therefore, not being certain whether his apprehensions as to the recovery of a judgment against him in a pending suit are well or ill founded, acts as if the judgment would be against him, and by conveyance puts his property in the name of another under a secret trust, he cannot complain if a court of equity leaves the parties in the position in which it finds them, and declines to set aside the conveyance."

"The statute contemplates a grant or conveyance with intent to defraud creditors. *It recognizes the moral quality of the act as residing in the intention.* The finding of facts discloses that the conveyance was made by Pride to Andrew with the intent, on the part of the grantor, to hinder, delay, and defeat the application of the property to the satisfaction of the claim in litigation in West Virginia, in case judgment should afterwards be recovered against him thereon. In other words, his design was that, if a court of justice should find the claim against him to be good and valid, his conveyance would serve to render nugatory the judgment recovered in the suit by his creditors. The claimants, it is true, did not succeed in establishing their claim, but, in view of the avowed intention of the grantor in the event of the claimants' success, a court of equity cannot so far regard with favor the conduct of the grantor as to aid in putting him and the grantee back in the condition in which they were before entering into the transaction." (Italics ours.)

The reason is well summarized in the sentence taken from the above quotation:

"It [the statute] recognizes the moral quality of the act as residing in the intention."

It is unnecessary for us to review in detail the respective cases cited by counsel, except to say that

in the large majority of those presented by counsel for defendant, while the more or less bald statement is made that, if there is no creditor who has been injured, the rule does not apply, the facts show that the original conveyance, though made by the grantor with an intent to defraud creditors, was induced by an active fraud on the part of the grantee in representing to the grantor that the indebtedness was a valid and subsisting one.

While this court has never passed directly on the precise question involved, we have held in the case of *Arizona State Bank* v. *Crystal Ice etc. Co., supra:*

"It is true that both the La Prades undoubtedly believed this claim of the Bankers' Bond & Mortgage Company to be morally unjust, and that it was based upon misrepresentations made to F. T. La Prade, nor can we say from the record that there might not have been some justification for such belief; but it cannot be permitted that debtors, no matter how honestly, may determine for themselves the legality of a possible indebtedness, and particularly it cannot be allowed that even upon such a belief, they may resort to a prohibited means to hinder, delay, or defraud the alleged creditor from enforcing any right he may establish according to the rules of law. The defendants testified they were both fully aware of the existence of the claim of the Bankers' Bond & Mortgage Company; that they believed that there was at least a possibility that it might be legally enforceable; and that the transfers were made to prevent such enforcement. They cannot now be heard to assert that it was not a claim of 'a creditor or other person,' within the provisions of paragraph 3273."

The maxim "He who comes into equity must come with clean hands" means "whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to inter-

fere on his behalf, to acknowledge his right, or to award him any remedy.'' Pomeroy's Equity Jurisprudence, 3d ed., par. 397. The very cause of the establishment of equity jurisdiction is that equity interposes only to enforce the requirements of conscience and good faith in matters outside of the rules of law, or even in contradiction to those rules. To hold that equity only applies the maxim in question when the attempted fraud actually succeeds would in effect place a premium on fraud, for the debtor could say, ''I may make the fraudulent conveyance without fear of loss if it proves in the end to have been unnecessary; the only case where I can possibly lose the property by refusal of my trustee to reconvey is when I would have lost it to a debtor otherwise. In one case I am sure to win; in the other it is merely a choice of to whom I will lose.''

After careful consideration of the cases cited and the reasoning contained therein, we are of the opinion that the fundamental requisite in determining in cases of this kind whether a party comes into court with clean hands is the moral intent, and not the actual injury done, and that the grantor cannot wash his intentionally soiled hands with the soap of an inability to carry out his intention and thereby invoke the jurisdiction of a court of equity.

There is, however, admittedly one exception even to the rule as laid down by us. When the parties are not *in pari delicto,* courts of equity will at times intervene for the protection of the less guilty one. Is there a test by which the application of this last-named principle may be determined? We are of the opinion such a test is well stated in the case of *Chamberlain* v. *Chamberlain,* 7 Cal. App. 634, 95 Pac. 659, 661:

''The law is more indulgent to human infirmity, and less tolerant of deliberate and obtrusive depravity. A. cannot lay a trap for B., secure his confi-

dence, induce him to make a conveyance of his property in the expectation that it will be returned, and thereafter retain the fruits of his perfidy on the ground that B. too readily yielded to temptation to save himself at the possible expense of creditors. The greater offense of the tempter overshadows and renders innocuous the weakness of the one of whom advantage is taken.''

. Tested by this rule, we are of the opinion that the parties were *in pari delicto*. The only support given to the suggestion they were not is found in the fact that, after defendant had been advised by his attorney that he might be liable for the Texas debts of Vaughn, and discussed the matter with plaintiff, she suggested the property be put in the name of someone as trustee, and not until defendant had considered the matter independently for a month or more and determined to deed the land to his secretary did she intimate she could act better as trustee. That she was then acting in good faith towards defendant is shown by her willingness to execute the Betts deed some time later.

But, even assuming without admitting that the parties were not *in pari delicto* up to the time of the last-mentioned deed, from and after that transaction the equities, or rather the lack of equities, were equal. Under our view of the law, the transfer to Betts is fraudulent on any theory, and both plaintiff and defendant were grantors therein. Had Betts stood on his deed, the trial court would necessarily have rendered judgment in his favor.

It is claimed by defendant that, since his property was a homestead, and not subject to execution, under no circumstances could a conveyance thereof be in fraud of creditors. This rule is upheld in Texas and perhaps in some other states, but we need not pass upon its validity, for the reason that under the law of Arizona a homestead exempt from execution can only be designated in a certain specific and affirm-

ative manner, and nowhere in the record does it appear that the land in question was so selected.

But it is urged by defendant that the constructive trust has been fully executed by plaintiff through her conveyance to Betts, and that, when a promise to reconvey, even though the original conveyance be made in fraud of creditors, is executed, the court will not apply the rule that equity will not intervene to set aside a conveyance made in fraud of creditors. Admitting for the sake of argument that this be true, we cannot see where it helps either plaintiff or defendant in the present action. If the constructive trust of plaintiff has been executed, defendant is not entitled to a decree compelling its execution, and, since the conveyance to Betts was made admittedly at the instance of defendant in order to defraud a certain Arizona creditor, then, urging his claim in the courts of Arizona, he is not in a position to ask the aid of a court of equity in enforcing any trust against Betts.

This disposes of all the matters raised by plaintiff or defendant which we consider necessary for a proper disposition of the case. The admissions of defendant and the findings of the trial court show conclusively that every transfer of the property we are asked to review was conceived in sin and born in iniquity, and that the parties thereto were engaged in a conspiracy to violate the criminal law of this state. If that law was not actually violated by them, it was not due to any lack of intent on their part, but to a mistake as to the facts which caused them to make the attempt.

To ask a court of equity under these circumstances to determine in whom the equitable title is, and to lend its assistance to compel a transfer of the legal title, is to ask it to disregard the fundamental principles on which its jurisdiction is based. The parties will

have to settle their difficulties among themselves without the aid of the equity jurisdiction of the courts of Arizona.

The judgment of the trial court is reversed and the case remanded, with instructions to dismiss the action, each party to bear his own costs.

McALISTER and ROSS, JJ., concur.