Ygnacia F. MURILLO, Administratrix of the Estate of Serapio G. Murillo, deceased; and Ygnacia F. Murillo, a widow, Appellant,

v.

Sara M. HERNANDEZ, Appellee.

No. 5930.

Supreme Court of Arizona.

April 5, 1955.

Alfred C. Marquez, Ralph Estrada, Daniel J. Sammons, Tucson, and H. Earl Rogge, Clifton, for appellant.

Gibbons, Kinney & Tipton, Phoenix, and James Boyce Scott, Clifton, for appellee.

UDALL, Justice.

Plaintiff, Sara M. Hernandez (appellee herein), brought an action against defendant-appellant Ygnacia F. Murillo, as administratrix of the estate of Serapio G. Murillo, deceased, and in her own individual capacity, seeking to establish a constructive trust in plaintiff's favor as to a one-half interest in certain realty situated in Clifton, Arizona. The parties will be referred to as they were designated in the lower court. The case was tried to the court sitting without a jury and no findings of fact were either requested or made. Judgment was entered in favor of plaintiff declaring a constructive trust to exist; setting aside a quitclaim deed given by plaintiff to her father (Serapio G. Murillo, now deceased), and ordering defendant to reconvey a one-half interest in certain lots and to make an accounting and pay over to plaintiff one half of the rents and profits accruing from said realty since the death of the decedent. Motion for a new trial was denied and this appeal followed.

There is but little, if any, conflict in the evidence and the facts may be summarized as follows:

Serapio G. Murillo and Benigna Murillo, husband and wife, had no children as issue of their marriage, and the plaintiff Sara M. (Murillo) Hernandez is their adoptive daughter. During coverture the adoptive parents acquired as community property city lots described in plaintiff's complaint. The wife Benigna Murillo died intestate April 29, 1937 and no steps were ever taken to probate her estate, but her husband continued to exercise control over this property. Thereafter, on October 17, 1937, Serapio married the defendant, Ygnacia F. Murillo, and during the coverture of this second marriage certain improvements were made and seven of the city lots described in the complaint were sold. These sales are in nowise disturbed by the judgment entered herein.

On June 21, 1945, Serapio Murillo as grantee obtained from plaintiff a quitclaim deed, conveying all of her right, title and interest in and to the lots described in the complaint. This deed recites that the grantor is the sole heir of Benigna Murillo, deceased, the consideration stated is $10 (though plaintiff testified no money was paid to her), and it is further recited that "The interest hereby conveyed is the sole and separate property of the grantee herein". Details as to the circumstances surrounding the giving of this deed will be set forth later. Serapio G. Murillo died intestate on August 24, 1951, and his widow was appointed as the administratrix of his estate. Upon the latter's refusal to recognize that plaintiff had any beneficial interest in the real property theretofore conveyed by her to decedent this suit was instituted with the result heretofore indicated.

**4**

Plaintiff testified in response to leading questions of counsel that her father in exercising control and management of the property belonging to him and her deceased mother was "doing it to protect my interest", she relied upon her father a great deal and "I trusted my father very much". Plaintiff and her husband had lived in Richmond, California, for some two years prior to the summer of 1945, when her father and stepmother made a special trip to California to see them. We quote the following from the reporter's transcript:

"Q. Sara, going back and calling your attention to June 21 of 1945 in Richmond, California when you stated that you and your husband and father were present at your residence in Richmond, California, what was the conversation, if any, between you and your father, regarding this Quit-claim Deed which was executed June 21, 1945 and marked plaintiff's exhibit 'A'? A. He wanted to borrow money and he needed my signature to borrow quite a bit of money, and he said he was going to look after my property and interest, and when I wanted my deed back all I had to do was ask him for it and he would give it back.

"Q. Sara, at the time your father talked to you there on this day when you signed this Quit-Claim Deed, which is Exhibit 'A', regarding this statement made to you by your father, did you rely on this statement in order to sign the deed? A. I had the most confi-

dence in my father and that is why I signed it.

"Objection by Mr. Estrada to statement.

."Court: Objection sustained.

"Q. Sara, at any time after you signed this Quit-Claim Deed did your father reconvey any of this property which you Quit-claimed to him in 1945? A. No sir.

"Q. Did you ever ask your father to reconvey to you? A. No, sir.

\* \* \* \* \* \*

"Q. Sara, at any time did you receive any income from this property which had been owned by Serapio and Benigna Murillo? A. No, sir.

\* \* \* \* \* \*

"Q. Did you ever ask him for any of the money? A. Never."

Two other witnesses testified as to statements made to them by Serapio G. Murillo relative to execution of the deed in question. The plaintiff's husband, Julian Hernandez, was asked:

"Q. What was that conversation? A. Well, it was about needing some money and wanting my wife to sign a deed so that they could get this amount of money, and he told her that as soon as he was on his feet again he would return it to her."

Gregorio Murillo, a nephew of decedent, testified that in June of 1945, he had a conversation with decedent, as follows:

"A. The first thing I asked him was about Sara. Where she was, and he told me she was in Richmond, Califor-

nia. Next he told me had to go to Richmond, California, and have her sign a deed to him so he could apply for a loan because he wanted to buy some more property.

"Q. Did he state to you his financial condition at that time? A. His financial condition was critical from his own words."

Plaintiff related several previous business transactions with her father. She testified that after the death of her mother, the father on August 5, 1939, gave her a quitclaim deed to a tract of realty in Clifton. It was later sold and she received the proceeds amounting to some $800.

When shown a group of cancelled checks signed by her father with her named as payee and bearing her endorsement, plaintiff's explanation was that "I was always borrowing money from him."

In the year 1947, as an investment plaintiff and her husband and her father bought a ranch in Tempe on a fifty-fifty basis, for which she signed the agreement to buy. The next year decedent purchased the Hernandez interest therein and they deeded this property back to her father, accepting $600 in cash plus a cancellation of her then indebtedness to him amounting to approximately $1,000.

Plaintiff built a home on one of the lots now in litigation and has been living in it "off and on" for about six years, although she has never paid any rent thereon because her "father said she did not have to." Her father, and since his death, his second wife have always paid all the utility bills.

The record further shows that plaintiff was of sound mind and normal intelligence. She was twenty-seven years of age when her mother died and thirty-five years of age when she executed the quitclaim deed in question. Prior to her marriage to Julian Hernandez she had been married to one Ruben Carvajal, although the date of this marriage does not appear. The record does not disclose that at any time since plaintiff first married she ever lived under the same roof with her parents or was a member of the Murillo household.

The only documentary evidence offered in support of plaintiff's testimony that her father wanted her to sign the deed so he could "borrow money" was a realty mortgage given 26 months thereafter (on August 22, 1947) to the Valley National Bank et al. to secure an indebtedness of $7,000. Nor is there any documentary evidence showing the acquisition of other lands to support the nephew's statement the deed in question was given "so he (Murillo) could apply for a loan because he wanted to buy some more property".

Defendant Ygnacia F. Murillo's only relevant testimony was that subsequent to her marriage to decedent four houses, financed by mortgage loans from the bank, were built on some of the lots.

At the conclusion of the plaintiff's case, the lower court stated:

**6**

"At this time I am a little doubtful about the trust being established. Record may show that the court withholds any motions on rulings (sic) at this time."

Later counsel asked the trial court to reserve its ruling as they were endeavoring to effect a compromise and more than ten months then elapsed before judgment was finally entered.

■ Defendant first contends that "The court erred in admitting evidence concerning statements of the decedent (grantee) in violation of sec. 23–105, A.C.A.1939." This statute prohibits testimony of a party in cases brought by or against an administrator concerning transactions and statements of the decedent, "unless called to testify thereto by the opposite party or required to testify thereto by the court * * *." Counsel recognize it has been our uniform holding that admission of such testimony rests in the sound discretion of the trial court, Stewart v. Schnepf, 62 Ariz. 440, 158 P.2d 529, but contends the court abused that discretion in the instant case by admitting testimony of plaintiff and her husband relative to decedent's promise to reconvey. From the record however it appears such an objection was not made to Sara's testimony, the objection made being that a confidential relationship had not been shown and that such statements would be hearsay. It is elementary that it is now too late for defendant to argue this question, as this court will not con-sider an objection that was not first made in the lower court. Leigh v. Swartz, 74 Ariz. 108, 245 P.2d 262. The logic of this rule is apparent in the instant case for there could be no abuse of a discretion the trial court was not asked to exercise.

■ Later, when plaintiff's husband, Julian, was asked to testify to decedent's statements, the prohibition of section 23–105, supra, was first raised. However, the objection was properly overruled as to his evidence because the statute in question has no application to testimony of one not a party to the lawsuit. Miller v. Miller, 7 Ariz. 316, 64 P. 415.

■ The law is settled in this jurisdiction that an express trust based upon an oral promise modifying the terms of a conveyance absolute upon its face may not be shown. Wright v. Young, 20 Ariz. 46, 176 P. 583. However, when circumstances appear which render it unconscionable for the holder of the legal title to retain and enjoy the beneficial interest, equity, on the theory of an implied fraud, impresses a constructive trust on the property thus acquired in the favor of the one who is truly and equitably entitled to the same. Whether on the facts recited a constructive trust may be impressed in favor of plaintiff is the controlling question presented by this appeal.

■ Both parties recognize the general rule that a constructive trust in the grantee is not created by the mere violation of a parol promise made by the grantee

to the grantor to hold the land in trust and to reconvey it on demand, in the absence of fraud in procuring the conveyance, Wright v. Young, supra. However, plaintiff relies upon an exception to this rule which has been recognized by this court, i. e., when a confidential relationship is shown to exist between two parties, even though no active fraud by the grantee in the procuring of a conveyance be shown, the mere existence of such confidential relation, when coupled with a promise to reconvey, creates a constructive trust. MacRae v. MacRae, 37 Ariz. 307, 294 P. 280; Dawson v. McNaney, 71 Ariz. 79, 223 P.2d 907. Whether such a confidential relationship was shown to exist is the major point on which the parties disagree.

On the one hand defendant asserts that as a matter of law the proof does not establish the existence of such a relationship. In support of this assertion she cites cases for the proposition that a preponderance of the evidence is insufficient as such proof must be "clear and convincing", and that proof of mere family relationship is not of itself sufficient to meet this requirement. Plaintiff concedes that the proposition of law invoked by defendant is correct, but contends that the evidence adduced is sufficient to establish the confidential relationship on which the trust is necessarily based.

Professor Bogert, in his work on Trusts, ably defines the scope of the confidential relation:

"There is no uniform practice among the courts in their use of the phrases 'fiduciary relation' and 'confidential relation'. In many decisions the words are used as synonyms. In most cases, however, the latter phrase is employed to indicate a relationship of a character similar to those mentioned above in the discussion of fiduciary relations, but not falling into any well-defined category of the law. The relations of trustee and cestui, executor or administrator and creditors, next of kin or legatees, guardian and ward, principal and agent, attorney and client, corporate director and corporation, and the like are easily thrown into distinct subdivisions of the law. They have distinctive names. The term 'fiduciary' might well be reserved for such relations.

"But there are other cases where there is just as great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative, but where the law has no special designation for the position of the parties. It cannot be called trust or executorship, and yet it is so similar in its creation and operation that it should have like results." Bogert on Trusts and Trustees, 1946 Ed., Vol. 3, Part 1, Sec. 482.

This court has previously had occasion, in cases seeking to establish a constructive trust upon an oral promise to reconvey, to determine that a wife and

8

husband stand in such a confidential relationship. MacRae v. MacRae, supra, Dawson v. McNaney, supra. However, in an analogous situation we stated: " * * * It [a confidential relation] does not, as a matter of law, spring from the relationship of *loco parentis* existing between the aunt and the niece * * *." Amado v. Aguirre, 63 Ariz. 213, 161 P.2d 117, 120, 160 A.L.R. 1126. Whether the relation of parent and child is a confidential relation upon which a constructive trust may be predicated has been the subject of much litigation in other jurisdictions. Discussion of many of the cases on the problem may be found in an annotation entitled "Grantee's oral promise to grantor as giving rise to trust." under subdivision III, c. 7 entitled "where parties are parent and child, grandparent and grandchild, father-in-law and son-in-law, etc." 35 A.L.R. 280, 314; as supplemented in 45 A.L.R. 851, 855; 80 A.L.R. 195, 206; 129 A.L.R. 689, 696; and 159 A.L.R. 997, 1009. In the last cited supplement the following statement of the rule as discernible from the cases appears:

" * * * while the mere relationship of parent and child does not necessarily warrant the conclusion of the existence of a confidential relationship requiring the court to raise an implied trust on the basis of an oral agreement made contemporaneous with a conveyance of property from one to the other, it is nevertheless an important circumstance bearing upon the existence of a confidential relation; and the later

cases disclose a number of instances in which a constructive or resulting trust has been raised upon an oral promise between parties sustaining the relationship of parent and child."

In most cases in which such a trust has been established it appears there has been shown in addition to family relationship, age and infirmity on one hand, actual dominance on the part of the grantee, an established course of management of the grantor's affairs by the grantee, or other similar facts making it inequitable to allow the grantee to prevail.

It is well established that where. as here, proof of the oral promise to reconvey is primarily dependent upon the testimony of an interested party who relates purported conversations had with a now deceased grantee, the trial court must scrutinize the entire transaction with great care. The courts recognize the weakness of such evidence, which lies, of course in the ease of its fabrication and in the danger of misunderstanding verbal statements. Furthermore, under the rule, admissions of persons since deceased, to show a trust, are received with great caution. See Annotation 23 A.L.R. 1528, entitled "VI. Effect of delay in assertion of claim, or death of parties to transaction." Therefore, in an equitable proceeding to enforce such a promise there is no question but what the proof of a confidential relationship upon which to base a parol trust

must be established by clear and convincing testimony.

The text writers and the courts have experienced difficulty in precisely defining this quantum of proof. See 20 Am. Jur., Evidence, sec. 1253; 32 C.J.S., Evidence, § 1023. In 54 Am.Jur., Trusts, sec. 621, the following statements appear:

"While the courts generally agree in requiring an extraordinary degree of proof to establish a parol or implied trust, it is difficult to say in what terms the required degree of proof should be stated * * *.

* * * * * *

" * * *. Still others have variously expressed the rule to be that the parol trust cannot be established by proof that it is doubtful, uncertain, and contradictory, or by conflicting, vague, or inconsistent statements, but only by clear, convincing evidence, evidence of strong and convincing character, clear and satisfactory proof, etc. Evidence capable of an explanation otherwise than by the existence of a trust is insufficient upon which to find a trust. The rule has been said, however, not to require mathematical certainty, nor does it require direct evidence or uncontradicted proof. It is sufficient, if the evidence is strong enough clearly to convince the court that a trust was declared, the terms of the trust being defined with clearness and certainty."

This court came to grips with the problem of what constitutes "clear and convincing" evidence in the equity cases of Costello v. Cunningham, 16 Ariz. 447, 147 P. 701, 710, and Stewart v. Schnepf, 62 Ariz. 440, 458, 158 P.2d 529. We adhere to those pronouncements and in writing this opinion have followed the pattern set in the Stewart case, supra, by setting forth in extenso the testimony necessarily relied upon by the trial court as establishing a constructive trust.

The Supreme Court of Utah, in the case of Paulsen v. Coombs, Utah, 253 P.2d 621, 624, laid down this rule:

"The question of whether evidence is sufficient to be clear and convincing is primarily for the trial court; his finding should not be disturbed unless we must say as a matter of law that no one could reasonably find the evidence to be clear and convincing."

See, also, Northcrest, Inc., v. Walker Bank & Trust Co., Utah, 248 P.2d 692. Our duty, on appeal, begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced mind might reasonably have reached the same conclusion which was reached. Using this test we are unable to say that the trial court's conclusion was so unreasonable that we should hold otherwise.

Judgment affirmed.

LA PRADE, C. J., and WINDES, PHELPS, and STRUCKMEYER, Jr., JJ., concurring.