NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.T.

No. 1 CA-JV 24-0064

FILED 08-06-2024

---

Appeal from the Superior Court in Mohave County
No. S8015JD202300010
The Honorable Rick A. Williams, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli, Phoenix
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge David D. Weinzweig joined.

---

**M O R S E**, Judge:

¶1　　　　Brandon H. ("Father") appeals the juvenile court's order terminating his parental rights. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2　　　　Father and Ashley T. ("Mother") are the biological parents of B.T. ("Child"), born in May 2010. Mother is not a party to this appeal.

¶3　　　　In January 2023, the court ordered Child into temporary physical custody due to Mother's substance abuse. At the time, Father's "whereabouts [were] unknown," and Child stated she had not seen Father in a "long time." The Department of Child Safety ("DCS") filed a dependency petition alleging Father was unwilling or unable to provide Child with proper and effective parental care and control and neglected to provide for Child's basic needs. DCS eventually located Father in Iowa.

¶4　　　　At the initial hearing, Father contested the petition's allegations and requested a dependency adjudication hearing. Following the hearing, DCS submitted a case plan for family reunification and prepared to offer Father an Interstate Compact on the Placement of Children ("ICPC") assessment to determine if Father would be an appropriate placement for Child. DCS also requested that Father self-refer to counseling and complete parenting classes in Iowa as part of the case plan. DCS indicated that it would reassess Child's case plan in August 2023.

¶5　　　　By March 2023, DCS reported that Father had begun weekly telephonic visitation and Child "expressed that she is trying to get to know her father." DCS also reported that it was actively "looking into Father" for an ICPC placement.

¶6　　　　Two months later, Father agreed not to contest the dependency petition, and the court adjudicated Child dependent. By July 2023, Child reported she did not want to have telephonic visits with Father because he did not initiate the calls and "she would always have to call him." DCS reported that all telephonic communication ended between Father and Child. But DCS also reported that "[w]hen [Child] is willing to participate with phone calls with [Father]," it would offer Father four hours a week of visitation. Father did not insist on continued telephonic visitation, dispute Child's characterization, nor attempt to initiate further telephonic visits. As to the ICPC assessment, Father reported that he "wants what is best for [Child]" and "feels that grandmother's house is the best suitable place for [Child]."

¶7 In August 2023, at a review hearing, Father indicated he was "respecting the child's wishes although he wants contact and a relationship with the child." Father also mentioned "other options of contact with [Child] and possible therapeutic visitation." The court set a permanency hearing for December 2023. A few weeks later, DCS invited Father to a team decision-making ("TDM") meeting to discuss changing the case plan and finding permanency for Child, but Father did not attend. At the meeting, DCS reported that Father's lack of communication made it difficult to determine whether Child would remain in out-of-home care.

¶8 Three months later, Child again reported that she did "not want phone calls with [Father]." DCS reported that visitation would "be available when [Child] is ready" and that DCS "has had no contact with [Father]." DCS also requested a "change of case plan to severance and adoption" as Child "expressed the desire to stay with her current placement" and "does not want to go home." The foster care review board agreed with DCS's request to change the case plan to termination and was concerned that Father was not engaging with DCS or participating in services. The court set an initial termination hearing for January 2024.

¶9 At the December 2023 permanency hearing, Father claimed that the report was "misleading" regarding his "engagement in services because [DCS] has not asked [him] to engage in any services." Father stated that he "has been ready and willing to engage with [Child], but he does respect her wishes but is worried regarding the no contact." Father objected to the change in the case plan but noted that he would file a "competing guardianship motion" if the case plan changed to "severance and adoption." DCS stated it would "reach out to [Child] to suggest phone contact with [Father]" and "work to set that up if [Child] is willing." The court found DCS "made reasonable efforts to complete the case plan of reunification" and granted DCS's request to change the case plan to "severance and adoption."

¶10 A week later, DCS moved to terminate Father's parental rights under the nine-months time-in-care ground. DCS claimed that it offered Father "case management services, case plan staffings, child and family team meetings, paternity testing, parent locator services, [a TDM] meeting, and visitation." At the initial termination hearing, Father contested the petition and requested a trial. The court set a trial for March 2024.

¶11 At trial, the court received DCS reports, case plans, and a TDM meeting summary into evidence and heard testimony from the DCS case supervisor and Father. The court found DCS "made a diligent effort to

provide appropriate reunification services such as visitation" and "[TDM] meetings." The court also found that Father "substantially neglected to remedy the circumstances that caused his child to be in out of home placements." Thus, the court concluded that DCS had proven the nine-months time-in-care ground by clear and convincing evidence and terminated Father's parental rights as to Child.

¶12 Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶13 Parents have a fundamental right to the custody and control of their children, but that right is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12 (2000). To terminate a parent's rights, a court must (1) find a statutory ground for termination under A.R.S. § 8-533 by clear and convincing evidence and (2) determine, by a preponderance of the evidence, that termination is in the child's best interests. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 474, ¶ 1 (2023); *see* A.R.S. § 8-533(B) (requiring at least one statutory ground and a best-interests finding). Because the court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004), we accept the court's findings of fact if reasonable evidence supports them and will affirm the court's "legal conclusions" terminating parental rights unless they are clearly erroneous, *Brionna J.*, 255 Ariz. at 478–79, ¶¶ 30–31. The court's legal conclusions are clearly erroneous only if we determine "as a matter of law that no one could reasonably find the evidence to be clear and convincing." *Brionna J.*, 255 Ariz. at 479, ¶ 31 (quoting *Murillo v. Hernandez*, 79 Ariz. 1, 9 (1955)). We do not reweigh factual or credibility determinations. *See Oscar O.*, 209 Ariz. at 336, ¶ 14 ("Our task for factual findings is solely to confirm that there is some reasonable evidence in the record to sustain them.").

¶14 Father argues the court's finding that DCS made a diligent effort to provide him with appropriate reunification services is not supported by the evidence. To terminate parental rights under the nine-months time-in-care ground, "DCS must prove (1) the child has been in an out-of-home placement for a cumulative total period of nine months; (2) diligent efforts have been made to provide the parent with appropriate reunification services; and (3) the parent has substantially neglected or willfully refused to remedy the circumstances that caused the child to be in an out-of-home placement." *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 59–60,

¶ 16 (App. 2015); *see* A.R.S. § 8-533(B)(8)(a) (nine-months time-in-care ground).

**¶15** Father claims that DCS "failed to implement a service plan that was particular" to his needs, "as it failed to provide paternity testing, failed to provide professionally monitored telephonic visits, ultimately failed to provide placement-monitored telephonic visits, and any other service, including therapeutic intervention to address [Child's] attitude towards visitation and reunification." The record shows DCS established paternity almost ten years ago in a previous dependency, making paternity testing unnecessary. The record also shows that DCS provided Father weekly telephonic visitation with Child. Father did not object to telephonic visitation or request professional or placement monitoring for those visits. Nor did he object to the court's findings following the review and permanency hearings that DCS was making reasonable efforts to finalize the permanency plan for Child, including providing Father parenting time with Child. The court also received a July 2023 DCS report showing that Father had not initiated any telephonic visits with Child after she stopped calling Father.

**¶16** As to "therapeutic intervention," the DCS case supervisor testified that therapeutic visits are arranged at the recommendation of a child's counselor. Child was receiving counseling, but the DCS case supervisor testified that Child refused visitation with Father, and "when the child refuses outright . . . we can't force them." While Father mentioned therapeutic visits and other options of contact at the review hearing in August 2023, he failed to attend the TDM meeting a few weeks later, where DCS discussed reunification services and Child's case plan. In fact, the record does not reveal any effort by Father to contact DCS between August 2023 and November 2023 to discuss alternative options for visitation or Child's case plan. At trial, the court noted that in cases where the child refuses visitation, "parents step up their efforts" by "coming out for visits, . . . sending cards, gifts or letters," which encourages the child to engage with the parent. But the court stated that Father made no effort to "even start down that road" and failed to take "any reasonable action to repair the bridge, to repair that line of communication other than just sort of sitting by and waiting to see what happened." The court acknowledged that Father sent a letter to Child but noted he sent it only "recently," even though he had "been aware since . . . July of 2023, if not earlier, that there's a problem, that [Child] does not want to talk to him." Thus, the court concluded "[i]n that context, I'm going to find that [DCS] made a diligent effort to provide appropriate reunification services such as visitation." We see no error in that finding.

¶17 Father also argues that he was unable to engage in services because DCS failed to inform him of those services as DCS "never sent him a service letter, had minimal contact with him, never initiated the ICPC process, and let the child dictate the management of the case." Father further noted that a DCS case supervisor doubted that DCS made a diligent effort to provide Father with appropriate reunification services. At trial, however, the court considered the evidence and concluded that despite "controverting evidence," Father was aware of services and "aware of at least some things going on in the case."

¶18 For example, the court highlighted that the August 2023 TDM meeting report indicated that Father was invited to the meeting, despite Father testifying that he was not invited. That report also shows Father did not attend the TDM meeting and that Father's lack of communication made it difficult for DCS to determine whether Child would remain in out-of-home care. The court noted that "DCS made a diligent effort to set up that connection between [Child] and [Father], just [Father] did not utilize that resource consistently or properly." *See Maricopa Cnty. Juv. Action No. JS-4283*, 133 Ariz. 598, 601 (App. 1982) (noting that while DCS has "the responsibility to make all reasonable efforts to preserve the family relationship," DCS's responsibility is "not without limits and at some point the [parent is] required to make a good faith effort to reunite the family"). Thus, the court concluded that DCS "made a diligent effort to provide appropriate reunification services such as . . . [TDM] meetings." We see no error in that finding.

¶19 As to the ICPC process, DCS did not complete the ICPC assessment with Father because he reported that he "wants what is best for [Child]" and "feels that grandmother's house is the best suitable place for [Child]," making DCS's efforts to place Child with Father futile. *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999) (requiring "the State to undertake measures with a reasonable prospect of success" but not "measures that are futile").

¶20 Father argues that a child's reluctance to participate in services with a parent may be relevant to the court's best-interests finding but not to the statutory ground for termination. But the court's finding that Child refused to have contact and reunify with Father is relevant to whether he substantially neglected to remedy the circumstances that caused Child to be in out-of-home care. *See* A.R.S. § 8-533(B)(8)(a) (requiring DCS to prove that the parent has substantially neglected or willfully refused to remedy the circumstances that caused the child to be in an out-of-home placement). Here, the court not only found that Child refused to have

contact and reunify with Father, but also found that DCS made a diligent effort to provide Father with appropriate reunification services and that Father failed to engage in those services or contact Child through other means in an effort to remedy the circumstances and reunify with Child. More specifically, the court found that Father "did not utilize" DCS resources "consistently and properly," and the record shows that Child did not want to continue telephonic visitation with Father because he did not call her and that "she would always have to call him." Accordingly, there is reasonable evidence in the record to support the court's findings, and the court did not clearly err in terminating Father's parental rights. *See Oscar O.*, 209 Ariz. at 336, ¶ 14; *Brionna J.*, 255 Ariz. at 479, ¶ 31.

**CONCLUSION**

**¶21**         We affirm.



AMY M. WOOD • Clerk of the Court
FILED:      AGFV