NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO N.L.

No. 1 CA-JV 24-0040

FILED 08-15-2024

---

Appeal from the Superior Court in Maricopa County
No. JS21704
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Perez Law Office, PLLC, Chandler
By Sabrina Perez-Arleo
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

---

Presiding Judge Brian Y. Furuya delivered the decision of the Court, in which Judge James B. Morse Jr. and Judge David D. Weinzweig joined.

---

**F U R U Y A**, Judge:

¶1              Cain L. ("Father") appeals the order terminating his parental rights to his child, N.L. We affirm.

### FACTS AND PROCEDURAL HISTORY

¶2              We view the facts in the light most favorable to upholding the juvenile court's findings. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 479 ¶ 32 (2023).

¶3              Melissa A. ("Mother") and Father are the biological parents of N.L., born in June 2016. When they met in 2015, Father was on probation for drug crimes he committed in 2012. He was also actively abusing illegal drugs, which Mother did not realize until she found him in the bathroom injecting heroin. Later, she would find needles, spoons, and foils he used for injecting drugs scattered about his room. He was also using methamphetamines and other illegal substances.

¶4              Father continued to abuse substances after N.L. was born. He also sold drugs to pay for his addictions. When still together, Mother pleaded with him to seek help for his substance abuse, but he was resistant to treatment and ignored her requests or grew angry.

¶5              In November 2016, when N.L. was about five months old, Father was arrested on new drug charges and for violating his probation. He spent about four months in Maricopa County jail. Then, in February 2017, he was sentenced to eight years of incarceration and transferred to a prison in Buckeye, Arizona.

¶6              While Father was in jail, Mother arranged for him to have video visits with N.L. After he was transferred to prison, she brought N.L. to see him every other week. But her visits gradually decreased over the next two years because Father's behavioral problems in prison—including many substance-abuse offenses—resulted in the prison system transferring

him to Yuma, Arizona. His last visit with N.L. was at the prison in Yuma in 2019.

¶7            During the first two years of Father's incarceration, he would call Mother collect every other day. But she stopped answering his calls in 2019 because he used the calls to ask her for favors or for money. The following year, when the COVID-19 pandemic began, the Arizona Department of Corrections provided him with a tablet that he could use to send emails. Mother signed up to receive emails from him, but she stopped emailing with him after about a year because he continued to ask her for favors and money. As a single mother, she also struggled to afford his calls and emails.

¶8            Meanwhile, Mother and N.L.'s stepfather started dating in 2018, and they were married in December 2023. N.L. was three when he met his stepfather, whom he refers to as "Dad." Mother and the stepfather also have a three-year-old child together and a child on the way. In August 2023, she petitioned the juvenile court to terminate Father's parental rights, alleging as grounds for termination: abandonment, substance abuse, neglect, and incarceration. She also obtained a termination social study, which recommended the court terminate Father's parental rights so N.L. could be adopted by his stepfather.

¶9            Father was released from prison on October 31, 2023. The next day, he met with his probation officer and admitted to using heroin two days earlier. He declined substance-abuse services, so instead they prioritized finding housing and employment. He moved in with his girlfriend and her children, and about a month later, he found a job as a truck driver for a contracting company.

¶10            The court held a termination trial on January 31, 2024. Following the trial, the court concluded that Mother proved by clear and convincing evidence that Father abandoned N.L. *See* Arizona Revised Statutes ("A.R.S.") § 8-533(B)(1). The court found Mother was credible when she testified that during her pregnancy and up until his incarceration in 2016, Father was under the influence of illegal substances daily. The court also found, during Father's incarceration, Mother worked to maintain Father's relationship with N.L. by taking N.L. for visits every other week and regularly accepting phone calls. However, Father received numerous disciplinary sanctions in prison "resulting in the reduction of privileges including the ability to interact with [Mother and N.L.]." The court further found that he did not work hard to maintain a parental relationship with his son and that his son had "no relationship" with him. Finally, the court

determined that terminating Father's parental rights was in N.L.'s best interests.

**¶11** Father timely appealed. We have jurisdiction under Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A), -2101(A), and Arizona Rule of Procedure for the Juvenile Court 601(a).

## DISCUSSION

**¶12** A parent's right to custody and control of his or her own child, while fundamental, is not absolute. *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 90 ¶ 25 (2019). The juvenile court may terminate the parental relationship where (1) clear and convincing evidence shows the existence of a statutory ground for termination under A.R.S. § 8-533, and (2) a preponderance of the evidence shows that termination is in the child's best interests. *Brionna J.*, 255 Ariz. at 477 ¶ 20. We accept the court's factual findings so long as they are supported by reasonable evidence and inferences, and we affirm the court's legal conclusions about the statutory grounds for termination unless they are clearly erroneous. *Id.* at 478–79 ¶¶ 30–31. We do not reweigh the evidence. *Maria G. v. Dep't of Child Safety*, 253 Ariz. 364, 366 ¶ 8 (App. 2022).

**¶13** In this case, the court terminated Father's rights based on abandonment. *See* A.R.S. § 8-533(B)(1). Arizona law defines "abandonment" as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8–531(1). A parent's "[f]ailure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.*

**¶14** In deciding whether a parent has abandoned a child, we consider "whether a parent has (1) provided reasonable support to the children, (2) maintained regular contact with them, and (3) provided normal supervision." *Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 430 ¶ 12 (App. 2023) (internal citation omitted). Incarceration provides neither a legal defense to abandonment, nor alone justifies termination based on abandonment, but it is one factor for the court to consider in evaluating a parent's ability to perform his or her parental obligations. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250 ¶ 22 (2000). When a parent cannot exercise traditional methods to bond with his child, "he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Id.* (quoting *In re Pima Cnty. Juv. Sev. Action No. S-114487*, 179 Ariz. 86, 97 (1994)).

¶15        In this appeal, Father argues the court's finding he abandoned N.L. is not supported by reasonable evidence because he made "more than minimal efforts" to maintain contact with N.L. He contends the record demonstrates that he cared for N.L. for the first five months of his life and that he had contact with N.L. through visits, telephone calls, and emails for the first few years of his incarceration. "[T]he juvenile court's legal conclusions regarding [abandonment]—which must be established by 'clear and convincing' evidence at the juvenile court level—will be affirmed unless they are clearly erroneous." *Brionna J.*, 255 Ariz. at 478–79 ¶ 31. Further, "the question of whether the statutory factor is supported by the mandated quantum of evidence will not be disturbed unless [we] determine[] 'as a matter of law that no one could reasonably find the evidence to be clear and convincing.'" *Id.* (quoting *Murillo v. Hernandez*, 79 Ariz. 1, 9 (1955)).

¶16        Before his incarceration, Mother described Father as "dozing off, basically on the verge of death every day" because of his drug use. He prioritized substance abuse over establishing a relationship with his child by using drugs daily. Indeed, he tested positive for heroin (and other drugs) on the day N.L. was born. And although Father testified about his stint as a stay-at-home dad, that lasted only five months before he was incarcerated.

¶17        After his incarceration, Father continued to undermine his relationship with N.L. by repeatedly committing drug and conduct-related offenses. He acknowledged at trial that his conduct while incarcerated resulted in him losing visitation privileges and being transferred to a prison in Yuma, far away from where Mother and N.L. lived. He also used telephone calls and emails, paid for by Mother, to ask her for favors and for money, instead of inquiring about his child. He has not sent N.L. a letter or card in three years, although according to Mother it has been much longer. Therefore, reasonable evidence and inferences support the court's finding that he did not establish and maintain a relationship with N.L. before and after his imprisonment.

¶18        The evidence in the record also supports the court's finding that Father never provided financial support for N.L. Although lack of support alone does not constitute abandonment, it is a factor the court considers when combined with "a poor history of visitation or contact." *In re Pima Cnty. Sev. Action No. S-1607*, 147 Ariz. 237, 239 (1985); *see also Michael J.*, 196 Ariz. at 250–51 ¶¶ 21, 24 (considering an incarcerated parent's level of support in determining abandonment). Before his incarceration, Father was unemployed and provided no financial support for his son; and whatever money he earned from selling drugs he spent on his addictions.

Nor did he provide any financial support for N.L. after his release from prison despite having employment. He also acknowledged at trial he had no evidence to show he had ever supported N.L.

**¶19** The record establishes that Father has not "provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Michael J.*, 196 Ariz. at 249–50 ¶ 18. Therefore, reasonable evidence supports the court's findings, and its conclusion that Father abandoned N.L. is not clearly erroneous because, as a matter of law, reasonable persons could find this evidence to be clear and convincing. *See Brionna J.*, 255 Ariz. at 478–79 ¶¶ 30–31.

**¶20** Father does not challenge the sufficiency of the court's finding that termination of his parental rights was in N.L.'s best interests. We therefore accept that finding and do not address it further. *See Michael J.*, 196 Ariz. at 249 ¶ 13.

## CONCLUSION

**¶21** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV

6