[Civil No. 4671. Filed November 27, 1944.]

[153 Pac. (2d) 534.]

ROY GADDY SHACKELFORD, a Minor, by E. T. Cusick, as His Guardian *Ad Litem,* Appellant, v. EMMA L. SWANTEK, as Administratrix With Will Annexed of the Estate of Nell Trotter, Deceased, Appellee.

Messrs. Cusick & Lyons, for Appellant.

Messrs. Kimble & McLean, for Appellee.

McALISTER, C. J.—This is an appeal by the plaintiff who unsuccessfully attempted to impress a constructive trust in his favor upon the funds held by the defendant in her capacity as administratrix of the estate of decedent, Nell Trotter. We refer to the parties as they were designated in the trial court, plaintiff and defendant.

The decedent, Nell Trotter, was a resident of Pima County, Arizona, and she died about the 12th of August 1941, and left a will, dated May 5, 1941, in which J. W. Trotter, her nephew, of Los Angeles, was named executor, but he did not qualify because he lived in another state. On October 29, 1941, Emma L. Swantek was duly appointed administratrix, and has been since then the acting administratrix of said estate. After the assets of the estate had been liquidated, the plaintiff, as guardian *ad litem,* filed a complaint to have the defendant declared a trustee of the funds remaining in her representative capacity upon the theory that they were the minor's money.

Nell Trotter was the maternal grandmother of the real party in interest, Roy Gaddy Shackelford, a boy about 16 years of age, who formerly lived at Green Bay, Wisconsin. The mother of the boy died in April,

1929, when he was less than two years of age and thereafter Nell Trotter, the minor and the father, Roy G. Shackelford, lived together at Green Bay, Wisconsin.

When the mother of the minor died she left him an inheritance of approximately $2,500 which "was placed with the New York Life Insurance Company for his benefit." It was deposited with that company in the name of Nell Trotter and Roy G. Shackelford, the maternal grandmother and the father, respectively, of the child and it remained there about 8½ years, or until September 1937, when it was withdrawn from the insurance company by Nell Trotter and the father. That company issued its check for $2,522.36, payable to Nell Trotter and Roy G. Shackelford and on October 4, 1937, this check was indorsed by both payees and cashed by Nell Trotter at the People's Trust & Savings Bank of Green Bay, Wisconsin, and the proceeds distributed as follows: $833.04 was deposited in that bank to the credit of Nell Trotter alone, and $1,689.32 was taken in cash by her; on June 6, 1938, Nell Trotter withdrew in cash $100 and on June 16, 1938, she withdrew the remaining $737.20 also in cash, thus closing the account.

Thereafter Nell Trotter and her grandson Roy went to Sierra Madre, California, where they remained for several months. The latter part of 1938, or early in 1939, she went to Tucson, Arizona, for a few days, and while there she purchased Lot 5 in Block 18, Amended Government Heights Subdivision No. 2, in her own name. Upon this property she built a small house which she and the boy occupied and upon the rear of the same lot she built, a little later, another house, which she rented for $20 a month for about two years. W. A. Shackelford, Roy's paternal grandfather, a builder by trade, lived in

Tucson, and he did most of the work on the first house, making no charge for his services. Others helped in building these houses, but they were paid for their work. Under date of April 9, 1939, Nell Trotter wrote Roy G. Shackelford from Tucson, Arizona, saying: "We got here the 11th of March. We have a little 12x20 house. Your Dad built the house for us and he did not charge us anything for the work." During the time they lived in the west Roy G. Shackelford, father of the boy, sent them about $500 to pay living expenses.

Throughout the trial the plaintiff contended that the residue of the estate was the minor's property, because, according to the testimony of Roy G. Shackelford, father of the child, with whom she lived for eight years before leaving for the west, the decedent "had no money other than that of my son's." She often declared that "she would keep Gaddy's money for him and take care of it for him, and all that is left is his." She also told Roy that he "was the owner of the real estate in Arizona."

Mrs. Swantek, administratrix, testified that Nell Trotter repeated many times that the property was to be left to Roy Gaddy Shackelford and that J. W. Trotter of Los Angeles, named executor of the will, was to take care of Roy Gaddy and raise him as his own with the probability that he would eventually adopt him. The will, however, devised all the property in Tucson, both real and personal, to J. W. Trotter absolutely, and said nothing whatever about his caring for the boy. Under date of July 19, 1941, Mrs. Trotter wrote Roy Gaddy at Sierra Madre, California, where he had gone after she became ill, and the wife of J. W. Trotter forwarded the card to him at Green Bay, Wisconsin, advising him to write Mrs. Swantek so she could take it to his grandmother to read and told him not to say anything about being

back with his dad, as the doctor did not want her to know this for the shock might be serious.

While in Sierra Madre, Nell Trotter kept one roomer and a boarder and followed the business of a corsetier, and in Tucson she also pursued corsetiering as a side issue. She purchased a small store near the Wakefield School in Tucson, for $157, and spent $50 in stocking it with groceries. She had borrowed $250 on a life insurance policy, on her own life, and used it in this way. But she had another policy that named no beneficiary and it was payable to whomever held it. J. W. Trotter cashed it for $90.51.

The trial was held on May 28th and 29th, 1943, and upon the latter date the trial court entered judgment that plaintiff take nothing and that defendant have judgment for her costs.

In his appeal the plaintiff contends that the court erred in rendering judgment for defendant because it is contrary to the evidence which shows that the $2,522.36 was left the minor by his mother, Margaret Shackelford, when she died. We think the evidence conclusively shows this to be true and that the father and grandmother held it in trust for him. The testimony of the father is that the boy's mother left him $2,500 and there is no evidence to the contrary. The evidence further shows that the father and grandmother placed or deposited this money for the boy's benefit with the New York Life Insurance Company where it remained about 8½ years. Just how or why this money was placed with that company and kept by it does not appear. The check of the company in payment of $2,522.36 recited: "In full settlement of all claims under policy No. 11538657." A copy of this policy would have thrown some light on this situation but we do not have the benefit of such evidence. However, the issuance of the company's check to the father and grandmother put the funds again in their

hands as custodians and the fact that the father permitted the grandmother to cash the check and take the proceeds made her solely responsible from then on. The father evidently, in allowing the grandmother to look after this fund, showed full and complete confidence in her honesty and ability to handle it. He had married again and had another family.

Soon after Mrs. Trotter withdrew the last $737.20, on June 16, 1938, she and her grandson left for the west and the father testified that "when she and my son left Green Bay it was understood that with this money she was to buy property in Tucson, Arizona, build what she could and that this was to be left in his name." However, they did not stop in Tucson long on their way west, but went to Sierra Madre, California, and there remained for several months. She came back to Tucson and purchased the lot in January 1939, about six or seven months after she left Green Bay, Wisconsin, and arranged for building, W. A. Shackelford having charge.

The trial court seemed to be of the opinion that:

"She had the boy for four years, and according to the plaintiff's contention, $2,500 to care for him would be about, according to my mathematics, $600 a year, fifty dollars a month. . . . But it is my opinion she spent all the boy's money and she didn't have any of it left to put in the house, that is all. She had already spent it on him. She did just what Roy Gaddy said she was supposed to do, keep Roy Gaddy's money for him and take care of him. She took care of him and all his money was gone."

But it was only about six months after she left Green Bay that she purchased the lot, and the first house was built in less than three months thereafter and the second within about three months after this. She could not have spent more than $400 or $500 for the support of the boy up to that time even at the rate of $50 a month, and it must not be forgotten

that by June 1, 1939, the father had sent them $375.83 for their support and after that date he sent about $125 additional, and from about June or July the second house was rented for $20 a month for about two years.

■■ We think it is very clear that she purchased the lot and built these houses with the funds of the boy and, therefore, they were his property. It was a legal fraud for Mrs. Trotter to devise this property to J. W. Trotter, her nephew, though she did not intend to defraud the boy as shown by her statement made to Mrs. Swantek, many times, that J. W. Trotter, to whom she willed this property, would raise the boy as his own with the probability that he would eventually adopt him. The confidential relation existing between grandmother and grandson demanded a truer discharge of her trust than that J. W. Trotter, who testified that she never said anything to him about either the will or the care of the boy, should be enriched at the boy's expense. There is no legal obligation at all imposed by the will upon him to look after the boy. The law, therefore, imposes upon this property a constructive trust. In Vol. 1 of Restatement of the Law of Trusts, on page 6, it is said:

"Both express trusts and resulting trusts are based upon a manifestation of intention of the person who creates them. An express trust is created only if the settlor manifests an intention to create it. A resulting trust arises where circumstances raise an inference that the settlor does not intend that the person taking or holding title shall have the beneficial interest. On the other hand, a constructive trust is imposed, not to effectuate intention, but to redress wrong or unjust enrichment. A constructive trust is remedial in character."

In *Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 122 N. E. 378, 380, Mr. Justice Cardozo uses this language:

" . . . A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Vol. 2, Restatement of the Law of Trusts, p. 1249; *MacRae* v. *MacRae*, 37 Ariz. 307, 294 Pac. 280; *Newman* v. *Newman*, 60 W. Va. 371, 55 S. E. 377, 7 L. R. A., N. S., 370; *Eckert* v. *Miller*, 57 Ariz. 94, 111 Pac. (2d) 60.

It is, therefore, the conclusion of this court that the judgment be reversed and entered for the plaintiff. It is so ordered.

ROSS and STANFORD, JJ., concur.