347 P.2d 568

**Emmet SMITH, Appellant and Cross-Appellee,**

v.

**Virginia Smith CONNOR; Lawrence J. Smith; and John Conley and Julia Conley, his wife, Appellees and Cross-Appellants.**

**No. 6430.**

Supreme Court of Arizona.

Dec. 16, 1959.

Rehearing Denied April 19, 1960.

Evans, Kitchel & Jenckes, Phoenix, for appellant and cross-appellee.

Moore & Romley, Phoenix, for appellees and cross-appellants.

STRUCKMEYER, Justice.

Appellees Virginia Smith Connor and Lawrence J. Smith (hereinafter called Virginia and Lawrence) brought this action in

the Superior Court for Maricopa County against their brother, Emmet Smith (hereinafter called Emmet), asking that a constructive trust be imposed upon certain fees and leaseholds held by Emmet. The trial court entered judgment in favor of the appellees, established the trust, and ordered that Virginia and Lawrence each be vested with an undivided one-third interest in the property. The trial court also decreed that Emmet make an accounting for the period of time that he was found to be the trustee.

■ The principles of law governing this case are substantially conceded by both parties. Although the statute of fraud prohibits the enforcement of an express parol trust in lands, Rogers v. Greer, 70 Ariz. 264, 219 P.2d 760, it has no application to constructive trusts which arise by operation of law and not by agreement. Bremer v. Bremer, 411 Ill. 454, 104 N.E.2d 299; Dietz v. Dietz, 244 Minn. 330, 70 N.W.2d 281; Stark v. Reingold, 18 N.J. 251, 113 A.2d 679; Pattison v. Pattison, 301 N.Y. 65, 92 N.E.2d 890.

The principle of law apparently applied by the lower court is as expressed in Restatement, Trusts, Section 44:

"(1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if

"(a) the transfer was procured by fraud, duress, undue influence or mistake, or

"(b) the transferee at the time of the transfer was in a confidential relation to the transferor, * * *."

The appellant contends that the trust should not have been imposed because the lower court's findings of fact that the land was transferred to him in trust and that a confidential relationship existed among Virginia, Lawrence and Emmet was not proved by the clear and convincing evidence which is required in this jurisdiction. Murillo v. Hernandez, 79 Ariz. 1, 281 P.2d 786; Stewart v. Schnepf, 62 Ariz. 440, 158 P.2d 529; Butler v. Shumaker, 4 Ariz. 16, 32 P. 265.

■ Unquestionably, a person who wishes to impose a trust on a transaction which on its face appears to be a valid transfer must convince the trier of fact of the trust by clear and convincing proof. But in our review of the evidence which led the trial court to its conclusions, we do not propose to retry the case on the appellate level. Our function is outlined in the Murillo case, supra [79 Ariz. 1, 281 P.2d 791].

" * * * Our duty, on appeal, begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced mind might reasonably have reached the same conclusion which was reached."

In following the holding of the Murillo case, we will examine the positions of the litigants concerning the various transactions and we will compare the testimony of the parties with the other evidence in a light most favorable to sustaining the judgment to see whether, as a matter of law, the trial judge acted reasonably in holding for Virginia and Lawrence. It is to be observed that it is consistent with the appellees' theory and the findings of the trial court that this transaction could have initially been innocently conceived as a plan to develop a family farm and that Emmet, after performing a major part of the work and labor attendant therewith, later decided to claim it entirely as his own.

Most of the issues of fact in this case are subject to dispute by the parties; however, on some matters there is agreement. The land in question, which we will call the Smith farm, is composed of four contiguous parcels of land, totaling some 1,400 acres in Pinal County, Arizona. These parcels, for purpose of clarity, will be referred to as Parcel A, Parcel D, Federal lands, and state lands. Other pieces of land, also situated in Pinal County, are germane to the lawsuit; they will be referred to as Parcel B, Parcel C, and Section 9 land.

The ownership of the land in the spring of 1951, before the many transfers began, was as follows:

Parcel A (320 acres)—Record owners of title Emmet, Lawrence and Virginia, as tenants in common, although at this time for some reason not disclosed, all three of them thought it belonged to Virginia alone.

Parcel B (36 acres)—owned by Virginia

Parcel C (480 acres)—owned by Lawrence

Parcel D (120 acres)—owned by John Conley, cousin of the litigants

Federal land (40 acres)—under lease by Federal government to an undisclosed party—possibly Leo Ellsworth

State land (960 acres)—leased from state by Leo Ellsworth

Section 9 land (320 acres)—owned by Lawrence

The event which precipitated the transactions in this case was the announcement by the Arizona State Land Department that land in the Queen Creek area of Pinal County was in a "critical area" under the provisions of the Groundwater Code. See Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764. By this proclamation, Virginia and Lawrence lost the right

to drill wells on Parcels B and C. In March of 1951, Emmet obtained information that the Section 9 land and Parcels A and D would be affected in the same manner by forthcoming proclamations. Emmet was advised to obtain noncancellable well-drilling contracts for the land.

Faced with the prospect of losing the right to drill wells on Parcels A and D and the land in Section 9, the members of the Smith family took steps to protect the value of their land. From July of 1951 on, all the land mentioned above changed hands, some of it several times; but by the end of 1951, Emmet either held the fee or Federal and state leases to the land which ultimately became the Smith farm. Parcels B and C and the Section 9 land did not become part of the Smith farm because they had been traded for state-leased lands in a transaction with Leo Ellsworth.

The parties offer diametrically opposed explanations for the events whereby the land became Emmet's property. Lawrence and Virginia state that the land was transferred to Emmet pursuant to an overall scheme to develop a family farm which Emmet would manage. Emmet insists that the land was transferred to him outright for a valuable consideration. He points to deeds from both Virginia and Lawrence which on their face recite such a consideration. In order to demonstrate what might have been the basis for the trial court's acceptance of the appellees' version of the facts, we will scrutinize the key transactions.

Both Lawrence and Virginia testified that early in 1951 they met their brother Emmet at their mother's house in Phoenix and discussed plans to develop a family farm in Pinal County. At that time, Emmet instructed Virginia to write John Conley, a cousin, proposing to trade some of the Section 9 land, then owned by Lawrence, for Parcel D which bordered on Parcel A. Lawrence corroborates Virginia on the fact that Emmet told his sister what the letter should contain, and that Emmet's name should not be mentioned. Emmet denies the entire conversation, but nonetheless a letter was written on April 5, 1951, and sent to Conley in Cleveland, Ohio, by Virginia. In May of 1951, Conley accepted the trade and sent to Virginia, in her name as grantee, the deed for Parcel D; however, no land was ever deeded to him in exchange. This is the way that Virginia describes the transfer of Parcel D from herself to Emmet:

"A. I placed the Conley land [Parcel D] in Emmett's [sic] name.

"Q. Why did you do that? A. The Conley land was contiguous to the east half of 18 [Parcel A], and it made a solid block there, and then that piece would be contiguous to the Federal grazing land, which Emmett wished to

get, and he couldn't get it unless he had land that was contiguous to it."

* * * * * *

"Q. What did Emmett pay you for the deed? A. He paid me nothing."

* * * * * *

"Q. What did he promise to do with regard to the property involved? A. Well, he promised that Jack [Conley] would be taken care of."

* * * * * *

"A. Yes, that Jack had been a good friend of our family and we would take care of him, we would see that he was recompensed for this.

"Q. What did he [Emmet] say with regard to how he would develop the land?"

* * * * * *

"A. He [Emmet] said he would go ahead and develop the land, that he had business experience and he would know how to get results and to develop it.

"Q. Did he say for whom he would develop the land?"

* * * * * *

"A. He would develop it for the family as a family enterprise."

The deed from Virginia to Emmet was dated July 11, 1951.

Emmet denies that he ever told Virginia to propose the trade with Conley and states that he did not know the circumstances under which Virginia received the land from Conley until Conley so testified at a deposition in Cleveland in 1956. He offers this version of the conversations at the time Virginia deeded Parcel D to him:

"Q. And did she say why she wanted to deed it to you? What did she say? Tell us that, what did she say when she came to your office? A. Well, she came to deed it to me, she wanted to deed it to me and there was some discussion about a non-cancellable well contract, and the question of the critical period was going—it was July, and the succeeding June, there had to be beneficial use of water from a well, and I told her that I would consider it, if I accepted it, it would be with no strings attached, as my own personal absolute property, and I suggested to her that she could get a well drilled herself, and I said, 'What I would like, if you are going to do this, if you are not interested in it, there is two and a half acres on the extreme southeast corner of 18.' So she made those two deeds to me.

"Q. Did you give her any consideration for them? A. I gave her a $10 bill for each deed.

"Q. Had you had anything to do with the acquiring of the 120 acres in the northwest quarter of 17 [Parcel D]? A. No, sir."

Under Emmet's theory (that from the start this farm was to be exclusively his), no reasonable explanation can be offered why Emmet should not have fully informed himself concerning the acquisition of Conley's property, Parcel D. The only logical reason for denying full information concerning the transaction between Virginia and Conley over Parcel D would be to support the allegation of his answer to Conley's claim that he, Emmet, did not agree to any reimbursement to Conley for the transfer to Virginia.

In March of 1951, Emmet obtained advance information that Parcels A and D would be in an area designated as "critical" by the State Land Commissioner. This sequence of events then followed: Emmet obtained a well driller by the name of Johnston to sign a noncancellable well-drilling contract to drill wells in Parcels A and D. The contract was supplemented by a further contract of a similar nature in June. In both instances Virginia and not Emmet signed the contract. Thus, Virginia assumed the legal responsibility for the expense of drilling these wells. It should be noticed that when the original contract was obtained in April, Emmet did not have the legal title to Parcel A, and neither Virginia nor Emmet owned any part of Parcel D.

Even before Virginia assigned the well contract to him in October of 1951, Emmet started drilling the wells. When the well contract was finally assigned, Virginia still held title to the land in Parcel A. The close cooperation among Emmet, Virginia and Lawrence throughout the period of time from April until October, when the well contract was finally assigned to Emmet, affords reasonable grounds for the trial court to infer that this was a joint effort by them, and hence part of the scheme for the financial betterment of each rather than solely for Emmet's benefit.

The trial court found that as another part of the general plan Virginia gave a deed to Emmet for the land in Parcel A in November of 1951. The testimony of Virginia and Emmet concerning this transfer is divergent, but here once again the circumstances and the inherent reasonableness undermine Emmet's position. Virginia stated in her testimony:

"* * * A. I executed a deed to the east half of 18 [Parcel A] to Emmett [sic], because he had told me a number of times that he needed to have all the property in one name, so that he could get finances and if he did not have it all in one name, he could not get financing, so for that reason, I placed it in his name. * * *"

She continues:

"A. I said to Emmett 'If the land must be in one name, to get financing, and you go ahead with the development of the land, I will place the deed to the east half of 18 in your name, but

I would like some kind of written statement showing that you have this family property, just in case of an emergency or something of that sort,' and Emmett said to me 'Don't you trust me?' He said, 'The Maryland Casualty Company trusts me. Why can't you trust me?' And I said, I still felt in case of death or emergency or accident, that the land would be all in Emmett's name, and would pass out of the family's possession, and we would have nothing in writing to show it. And he said, 'I will have nothing to do with the Title & Trust Company, because they would tie my hands.' He said, 'I will make the decision and I will develop the land, but I will not have my hands tied.'

"Q. What did he say about who was going to develop the land, who he was going to develop the land for? A. For the family enterprise, he was going to look out for the family security."

Emmet offers a different version of the transaction.

"Q. Now, at any time did you tell her anything about that you were going to hold those pieces of land [Parcel D and a well site] for her benefit? A. No, sir.

"Q. What did you say with regard to having those two pieces of land conveyed to your name? A. Well, she wanted—she brought the matter up, as to the rest of the east half of 18, deeding that, and I said, 'Mother told me not to take it, to have Frank [Virginia's husband] and Virginia develop their own land, to put their own well on it.'"

* * * * * *

"A. * * * And I said, 'Again, Virginia, I want no part of the joint arrangement with you, or Connor [Virginia's husband] or anybody else.'"

* * * * * *

"Q. So when you were getting these papers signed by Virginia, you at that time believed that she was the sole owner of Section 18, is that right? That is the east half of Section 18. A. I didn't ask her to sign any papers. I believed when she signed the deed on her own volition that she owned the east half of 18.

"Q. You didn't ask her to sign anything? A. No, sir.

"Q. You didn't want her to? A. I didn't care."

On October 16, 1951, a month before the date of the warranty deed from Virginia to Emmet, one O. C. Williams wrote to Emmet recommending that

" * * * title to the land be under an individual ownership presenting the

financial resources to be responsible for the liquidation of the mortgage * * *."

O. C. Williams was the man through whom Emmet hoped to get a loan to finance the farm. Hence, it appears plausible and even probable that Virginia executed the deed to Emmet for Parcel A, so that he could get financing. Emmet's testimony that he "didn't care" is inherently unreasonable because Parcel A was the key parcel to the establishment of an integrated farm.

At one time, either the day of, or the day after receiving the letter from O. C. Williams, and before receipt of the deed to Parcel A from Virginia, Emmet employed an attorney to write up a trust agreement in which Lawrence, Virginia, and one Margaret A. Smith, the mother, donated to Emmet as trustee Parcels A and D, state land, and the Federal lands. Emmet seemingly never advised the other members of the family that he had had the trust agreement prepared, and it was never executed by him, possibly because he was able to obtain the land from Virginia without executing an instrument showing that this was a family property.

The financial aspects of the transaction stress the likelihood that the transfer was made pursuant to a family plan. Emmet claims that the consideration for the deeds was $10 and love and affection. The value of the land at the time of the transfer was subject to differing estimates. Emmet said the land was worth no more than $10 an acre, while O. C. Williams estimated the value of the land in that area as $25 an acre. Even if the figure which Emmet suggested is used, it would mean that Virginia gave Emmet property in Parcel A which he thought at the time of transfer was worth $3,200 in exchange for $10 and love and affection. The estimate given by Williams would have meant that Virginia surrendered the legal title to property worth $8,000. The trial court could properly weigh the apparent disparity in consideration in reaching its findings that the transfers were part of a family plan rather than a gift by other members of the family to Emmet.

Emmet rests his case in part on two groups of two deeds which were signed by Virginia on June 29, 1952 and on July 1, 1952. They were entitled "gift deeds" and conveyed Parcels A and D from Virginia to Emmet. They covered the same parcels of land as the prior warranty deeds given in the summer and fall of 1951. Virginia testified that she did not remember signing the deeds of June 29, 1952 but that she signed the deeds of July 1, 1952 under the following circumstances:

"Emmet came to me in mother's house, and he had some deeds in his hand, he was excited, he was in a hurry, he said, 'I have been frustrated

time and time again in the development of this land, and I have been hindered and impeded in the development of this land,' and he said, 'The warranty deed that you gave me is illegal, and I must have a proper deed to proceed with the development of this land, and to the financing of it,' and he said, 'This is a proper deed.' "

It is to be noted that Emmet testified that the reason for the deeds of July 1, 1952 was because the set was signed on June 29, 1952, Sunday, and hence not valid. He now argues that the representation of illegality of the prior deeds was not material and could not have been relied on by Virginia for the reason that when Emmet requested gift deeds from Virginia, the question for her to determine was whether she wanted to make a gift to Emmet. We believe that the representation by Emmet of illegality referred to the 1951 deeds and was material for the reason that the question for Virginia to determine at the time of execution of the 1952 deeds was whether she would carry out the original plan to develop a family farm in order that Emmet might proceed in its development. The trial court could believe, if any credit is to be given to Virginia's testimony, that the gift deeds of 1952 were procured on a false representation by Emmet.

At this time in 1952, when the gift deeds were presented to Virginia to sign, Emmet had already borrowed money to make im-provements costing about $40,000. Wells had been drilled and land had been leveled. A tenant for the farm on a share-crop basis had been found and the value of the farm was reaching $200,000. In short, the venture was well on its way to being a success. The trial court could have believed that this motivated Emmet in devising means of establishing that the land was his alone.

While it is true that the gift deeds recited $10 and love and affection, the testimony established that Emmet gave his sister checks for each of these deeds, but that the checks were not processed through the bank by Virginia. Instead, Emmet was given back the checks after Virginia had endorsed them to him. This suggests that the only purpose in giving checks to Virginia was for Emmet to have a written record that consideration had actually passed to Virginia and supports the further inference that the entire deed transaction of 1952 was a calculated device to deprive Virginia of any possible interest in the property. The court below could have found that the 1952 transfers were procured by actual fraud.

In September of 1952, Lawrence executed a gift deed of Parcel A to Emmet. At that time, it appeared that Lawrence had an actual interest in Parcel A, although it had been assumed up to that time that Lawrence had no interest whatsoever therein. Lawrence testified that the purpose of giving this deed was to continue the financing

by Emmet; hence, was given pursuant to the original plan for Emmet to establish a family farm and comes within the contemplation of a transfer by one in a confidential relation to the transferor. Restatement, Trusts, Section 44, supra.

In summary, we think that the trial court had before it evidence which was sufficiently clear and convincing so there could be found, in the language of the Restatement of Trusts, that this land was transferred to "another in trust for the transferor." As stated, before a trust may be imposed on the land, the trier of the facts must also be convinced that the transfer was procured by fraud or that a confidential relationship existed at the time of the transfer. Suffice it to say that from our examination of the transcript and from the lower court findings of fact, there is no indication, with the exception of the gift deeds, that Emmet practiced actual fraud in procuring the various transfers of title.

There are certain principles of confidential relationships which are commonly accepted. First, it is beyond question that brothers and sisters may stand in a confidential relationship. Carrillo v. Taylor, 81 Ariz. 14, 299 P.2d 188; and see Lawton v. Strong, 6 Cir., 249 F.2d 299; Box v. Box, 146 Neb. 826, 21 N.W.2d 868; Sinclair v. Purdy, 235 N.Y. 245, 139 N.E. 255. It is also clear that the mere physical relationship of members of a family is not enough per se to invoke a constructive trust. Murillo v. Hernandez, supra; Amado v. Aguirre, 63 Ariz. 213, 161 P.2d 117, 160 A.L.R. 1126. A constructive trust is not a device reserved only for situations in which one of the parties, because of age or infirmities, is actually dominated by the other party, although many cases have arisen because of a disparity in age or intellect. Even where actual fraud does not exist in the acquisition of property, a constructive trust will arise whenever the circumstances make it inequitable that the property should be retained by the one who holds the legal title. Linder v. Lewis, 85 Ariz. 118, 333 P.2d 286.

We are satisfied that in order to impose a constructive trust in cases where the parties are related by blood or marriage, the trial court must be persuaded by clear and convincing evidence that a confidential relationship existed at the time of the transfer and that the transferor conveyed the property on the strength of the relationship to the transferee. The evidence that we have already outlined above shows not only the existence of an agreement among the members of the Smith family, but also that the transfers were made to Emmet pursuant to that agreement. One question remains: was there a confidential relationship at the time of the transfers? The Restatement of Trusts, drawing from the case law, suggests that a confidential relationship exists

" * * * not only where there is a fiduciary relation such as exists between attorney and client * * * but also where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." Restatement of Trusts, Comment on Subsection (1, b), § 44, p. 137.

In scrutinizing the evidence in this case, we concur with the findings of the trial court that Virginia and Lawrence both relied on Emmet's judgment and promises, and were justified in so doing.

Much of the proof of the reasonableness of the transferor's trust in the transferee may be derived from the fact that the transferor did deed the property to the transferee; however, in the instant case, there are events and facts in addition to the transfers themselves which indicate the confidential nature of the relations in the Smith family. Lawrence, Emmet and Virginia all lived with their mother until Virginia's marriage in 1947 when she was 43 years old. Virginia left the family home then, but continued to visit her mother and her brothers regularly. Emmet, who was the oldest, was an experienced insurance agent who had had considerable experience in real estate, while Virginia was a school teacher and Lawrence worked as a farmer,

sometimes on his own land and for a time with Leo Ellsworth as a farmhand. The record contains many references to the manner in which Lawrence depended on Emmet for financial support and for guidance. The testimony of disinterested witnesses, some of them called by Emmet, indicates that Emmet was the dominating person in the family and that the others acquiesced in his judgment.

It is evident from the record that Emmet took an active part in controlling the use of the land, even before he had it in his possession. Early in 1951, Emmet appeared before the State Land Department and urged that his brother's and sister's land, Parcels B and C, not be included in the "critical" area. It was Emmet who later contacted the State Land Commissioner and found that other lands were going to be declared "critical."

There is one item in the record which might have indicated a dwindling in the family unity. About the time that Emmet was bargaining with Leo Ellsworth about trading land in Section 9 for the state-leased land, John Francis Connor, Virginia's husband, was working for a land syndicate and had procured options on some of the leased land in which Emmet was interested. It is otherwise apparent from the transcript that there has been considerable ill feeling between Connor and Emmet; but it is doubtful whether this feeling between Connor and Emmet caused Virginia to dis-

trust him. Virginia's actions in deeding the property to Emmet in the face of the dispute between her husband and her brother reinforces the idea of the brother's domination.

We cannot say as a matter of law that the trial court did not have clear and convincing evidence of the confidential relationship. We have mentioned just a few incidents contained in a lengthy record and have not mentioned Virginia's and Lawrence's own statements that they trusted their brother. Such declarations are best evaluated by the trial judge who had the witnesses before him. It was his burden to evaluate the probative force thereof.

The appellant argues that we should clarify the rule on constructive trusts and apply this criterion: That the true test is whether or not the trial court had before it evidence which is so clear, strong, convincing and unequivocal as to remove from the mind of an unprejudiced person every reasonable doubt as to the existence of the material facts. The appellant suggests that "If this Court entertains any reasonable doubt as to the existence of such material facts the judgment of the lower court cannot be sustained."

█ It is true in some instances that courts have used such language as "reasonable doubt" in deciding cases involving constructive trusts. See Tillman v. Pitt Cole Co., Fla., 82 So.2d 672; Parsons v. Crawford, 193 Okl. 537, 145 P.2d 932. However, in this jurisdiction, as well as in the majority of others, the court has required only that the evidence be clear and convincing. Carrillo v. Taylor, supra; Murillo v. Hernandez, supra; Stewart v. Schnepf, supra; Costello v. Cunningham, 16 Ariz. 447, 147 P. 701; Butler v. Shumaker, supra; 3 Bogert, Trusts, § 472, p. 13; 4 Scott, Trusts, § 462.6. We reiterate that the decision in the Murillo case sets out the proper course of action for an appellate court when it states that our task is to determine whether in the circumstances " * * * an unprejudiced mind might reasonably have reached the same conclusion which was reached." [79 Ariz. 1, 281 P.2d 791.]

What we have said disposes of most of appellant's assignments of error. The nature of the agreement among the members of the family and the existence of the confidential relationship are the two central issues of this case.

█ It is urged that the judgment of the lower court is erroneous because the court included the Conley land and the Federal land in the constructive trust. It is true that at the time Virginia deeded the Conley land (Parcel D) to Emmet, she had not paid anything to Conley for it, and as to this, Emmet was not unjustly enriched at Virginia's expense. However, as the result of this lawsuit in which the Conleys were

also plaintiffs, they have been awarded a judgment of $3,000 against Emmet, Virginia and Lawrence in payment for Parcel D. We fail to see why the property should not be included in the trust since both Lawrence and Virginia are liable on that judgment.

In reference to the Federal 40 acres, Emmet argues that this parcel should not have been impressed with the trust because he purchased it directly from the Federal government for $400. The trial court found that Emmet obtained this property from the Federal government pursuant to the overall plan to develop the Smith farm. Since the farm is an integrated unit, the trial court could believe that this was part of Emmet's contribution and justifies the decree of the court below awarding Emmet an undivided one-third interest in the farm as a whole.

The appellant concludes his appeal by asserting that the appellees are estopped from subjecting Emmet to a trust because they waited until the farm appeared to be a financial success before they claimed any interest in the farm. It is obvious that such an assertion is clearly contrary to the findings as made by the trial court. The import of the trial court's findings is that Emmet understood that the appellees have always claimed an interest in the farm. The record contains several instances when Virginia suggested that Emmet prepare documents to clarify the interests of the members of the family.

To apply the doctrine of estoppel to cases in which courts find a constructive trust because of the violation of a confidential relationship would lead to an anomaly. The essence of the confidential relationship is that the transferor was justified in transferring the property to the transferee because of the faith and trust which the transferor had in the transferee. Because of this trust and faith, it is unlikely that the transferor will challenge the right of the transferee to hold the property. In such a situation, it would defeat the purpose of the constructive trust if the transferor's silence estopped him from insisting upon his rights.

In a cross-appeal, the appellees have urged that the trial court should have returned the parties to the status quo which, they say, would mean that Emmet would be left with only his one-third interest in Parcel A. The basis for this argument is that Emmet as a trustee repudiated his trust by denying appellees' rights in the property. We note no authority is cited for this claim. A constructive trust is imposed by a court of equity to protect individuals' interests from unconscionable conduct. Shackelford v. Swantek, 62 Ariz. 86, 153 P.2d 534. Among the activities which the trial court considers in imposing a constructive trust is the failure of the

transferee to acknowledge the rights of the transferor. As a remedy for such a failure, the courts turn to a legal fiction and declare that the transferee has been acting as a trustee from the time of the transfer. 3 Bogert, § 471, pp. 3–6. It would be inequitable for the court to return the parties to the status quo in a case where, as here, the transferee has expended so much of his own time and money to develop the project.

Affirmed.

PHELPS, C. J., and UDALL, JOHNSON and BERNSTEIN, JJ., concur.