415 P.2d 151

**Arthur W. JACOBS and Rose Jacobs, his wife, Appellants,**

v.

**Edward C. JACOBS and Caroline B. Jacobs, husband and wife, Appellees and Cross-Appellants.***

**No. 2 CA–CIV 80.**

Court of Appeals of Arizona.

June 8, 1966.

Rehearing Denied Aug. 15, 1966.

Fickett & Dunipace, Robert D. Stauffer, by Fred W. Fickett, Tucson, for appellants.

Boyle, Bilby, Thompson & Shoenhair, by W. E. Dolph, Jr., Tucson, for appellees and cross-appellants.

ROBERT E. McGHEE, Superior Court Judge.

Appellants were plaintiffs in an action to establish and terminate a trust, and appellees are cross-appellants on a claim to quiet title to land in Pima county, and a claim for money due on loans made to plaintiffs. They will be referred to in this opinion as plaintiffs and defendants as they appeared in the lower court. There were no findings of fact, so we will briefly state so much of the evidence as is pertinent to this opinion. The plaintiff, Arthur W. Jacobs, and defendant, Edward C. Jacobs, are brothers. The land involved is four patented mining claims located in

---

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8146. The matter was referred to this court pursuant to A.R.S. Section 12–120.23.

Pima county, known as the "Goat Ranch." In December 1945, Arthur Jacobs purchased the property in his own name from the State of Arizona through the Pima County Board of Supervisors, it having been deeded to the state because of non-payment of taxes. Edward had previously owned an interest in the property and furnished Arthur the money with which to purchase the property from the state after Arthur had informed him that he had read a notice advertising the property for sale. In 1951, Arthur delivered to Edward a quitclaim deed to the property. Arthur's wife, Rose Jacobs, refused to sign a quitclaim deed, and Edward then filed a quiet title action against both Arthur and Rose, who defaulted, and on March 17, 1953, judgment was taken against them quieting title in Edward.

In August 1954, Arthur and Edward entered into an agreement setting out that: (1) the property had been purchased with money furnished by Edward with the understanding that it would be jointly owned by them, and that Arthur would hold a one-half interest in trust for Edward, (2) in June 1951, Arthur had conveyed to Edward with the understanding that Edward would hold a one-half interest in trust for Arthur, (3) Edward might sell at his discretion, but that upon sale Edward was to deduct the sum of $1,700 and any expenses, and then divide the proceeds equally between them, and (4) the parties agreed that Edward did then hold in trust a one-half interest in the property subject to the conditions just stated. The purported trust agreement was drafted by Carlos G. Robles, a Tucson attorney and brother-in-law of Arthur Jacobs, who testified that he was a friend of the brothers and put in the agreement the claim of each brother as stated by them.

It appears that Arthur found a purchaser willing to give $16,000 for the property, but Edward refused to sell unless Arthur would accept $2,000 as his sole share of the proceeds of the sale. Edward apparently threatened to convey the property to a relative for $1,700. As a result of the differences between the brothers, Arthur brought an action to establish his rights under the purported trust agreement, to terminate the purported trust, to appoint a receiver to sell the property, and to enjoin the sale of the property for less than its reasonable market value.

Defendants counterclaimed asking: (1) that title be quieted in them, (2) that the purported trust agreement be adjudged of no effect, (3) for a judgment in the sum of $800 for loans made to plaintiffs, and (4) for costs and attorney's fees.

Plaintiffs appeal from the judgment of the superior court quieting title in defendants, and defendants appeal from that part of the judgment denying attorney's fees, denying recovery on the loans, and ordering that the parties bear their own costs.

Plaintiffs base their assignments of error and argument squarely on the theory that their right to relief arises from a trust agreement and not from any theory of extrinsic or intrinsic fraud. In advancing the theory that Edward was holding the property in trust, plaintiffs argue that when Edward sued Arthur and his wife to quiet title he was suing as a trustee for the purpose of removing the cloud upon the legal title by virtue of the refusal of Arthur's wife to sign the quitclaim deed. They support their contentions with the legal propositions that: (1) a trustee must act in the interest of the trust; (2) where the trustee moves to establish title in himself as sole owner of the fee of the trust he is guilty of fraud upon the beneficiary of the trust; (3) where a trustee brings a quiet title action only to perfect legal title in himself as a trustee he does not violate the trust and is not guilty of fraud; (4) in cases of an ambiguity of the act of the trustee the law will presume the trustee performed the act for a proper motive; (5) property acquired by a trustee or by one holding in a trust relationship, is unaffected by the marital status of the trustee; and (6) where a trustee holds legal title to real property to be sold and the proceeds

divided, the beneficial interest is personal property.

We will not attempt to discuss the propositions in full for the reason that we feel that they have no application in this action. Had they been urged by defendants in an answer to the 1953 quiet title action against Arthur and his wife they may well have caused a more just settlement of the dispute between the brothers and their wives and we would not find ourselves trying to fathom the dealings of these brothers starting in December 1945.

Plaintiffs' position is that after the purchase from the state, Arthur held in trust an undivided one-half equitable interest for Edward, and that the position reversed upon Arthur's deed to Edward in 1951. The testimony of the two brothers differed widely concerning the original purchase from the state. Arthur claimed that Edward gave him the money to bid on the property with instructions to hold it in Arthur's name, and upon sale they would split the profits. Edward's version was that he had asked Arthur to bid for him, but that Arthur had bid in his own name without Edward's knowledge, and that when he found out about it he had demanded a deed back from Arthur which was delivered on June 15, 1951.

There were no findings of fact requested. There was evidence from which the court could have concluded that there was no oral agreement to share in the land or the proceeds of its sale prior to the execution of the purported trust agreement in August 1954. Edward explained the agreement by testifying that he signed the agreement only because Arthur was in financial distress, and at the time it was signed the value of the property was such that each would have profited to the extent of approximately $2,000. Under the circumstances we must assume that the trial court found the facts essential to sustain the judgment, there being testimony, although conflicting, from which it reasonably could have done so. Porter v. Porter, 67 Ariz. 273, 195 P.2d 132 (1948); Rossi v. Stewart, 90 Ariz. 207,

367 P.2d 242 (1961). The deed from Arthur to Edward was prepared by Arthur and contained no indication that he was conveying to a trustee or that he retained any interest in the property. The testimony of Edward was that Arthur's wife had refused to sign a later quitclaim deed because she in the past had experienced some kind of difficulty by signing papers. Since Edward was also married it is difficult to see how the plaintiffs could think that the title would be any more merchantable in the name of Edward than in the name of Arthur. Edward may have appeared to be impeached upon a showing that in 1947, 1948, and 1949 he had paid taxes on the property. The 1949 tax receipt, the only. one in evidence, showed the property was among twenty pieces of property assessed to Arthur. Edward testified that during the period from 1947 to 1951 Arthur managed a hotel and ran errands for him, such as making tax payments. Upon further questioning by the court Edward testified that he first knew that the property was in Arthur's name shortly after the death of their father in 1950. We cannot say that the evidence clearly shows that Edward knew the property was in the name of Arthur prior to 1950.

Defendants contend that the former quiet title judgment is res judicata and not subject to collateral attack. The complaint therein sets out that Edward was the owner in fee simple; that the defendants claimed some estate, interest or right adverse and in conflict with plaintiffs' title; and that the defendants had "no *estate, right,* title, *claim* or *interest* in said lands, or any part thereof, and the claims of the defendants were without any right whatsoever." (Emphasis added.) The prayer of the complaint prayed for judgment that title to the lands be in plaintiff "free and clear of any claim of the defendants, and that defendants be barred and forever estopped from claiming or having any *right* or title to the lands above described adverse to plaintiff." (Emphasis added.) The judgment, signed on March 17, 1953, found that "the allegations

of plaintiff's amended complaint are true." It adjudged that the plaintiff have judgment as prayed for; that all adverse claims of defendants were invalid and groundless; that the "plaintiff be, and he is hereby declared and adjudged to be, the *true and lawful owner* of the land, described in his amended complaint * * *" (emphasis added); " * * * that his title thereto is adjudged to be quieted against all claims or demands of the defendants, or either of them, who are hereby perpetually estopped from setting up any claim or claims thereto * * *." It is an incredulous assumption to suppose that Arthur could have thought that the statement that he had "no estate, right, title, claim or interest" in land would be subject to an interpretation that he in fact owned an undivided one-half interest with merely the legal title held in trust by Edward. Black's Law Dictionary includes the following definitions of the term "fee simple":

> "An absolute or fee-simple estate is one in which the owner is entitled to the entire property, with unconditional power of disposition during life, and descending to his heirs and legal representatives upon his death intestate. * * * Unlimited as to duration, disposition, and descendibility. * * * [T]he largest and most extensive interest that can be enjoyed in land."

It could only be through some legal fiction that we could hold that the complaint claimed for the plaintiff anything less than full legal and equitable ownership in the land.

There should be no doubt that in Arizona both legal and equitable claims can be settled in a quiet title action. Mason v. Ellison, 63 Ariz. 196, 160 P.2d 326 (1945); Ely v. New Mexico and Arizona Railroad Co., 129 U.S. 291, 9 S.Ct. 293, 32 L.Ed. 688 (1889); 2 Moore's Federal Practice, 2d ed., § 2.06; 16 A.R.S. Rules of Civil Procedure, Rule 2.

The judgment was res judicata as to each point decided and also as to every point raised by the record which could have been decided. 16 A.R.S. Rules of Civil Procedure, Rule 13(a); Adams v. Bear, 87 Ariz. 288, 350 P.2d 751 (1960); Fletcher v. State ex rel. Morrison, 90 Ariz. 251, 367 P.2d 272 (1961); Restatement, Judgments § 68, comment f. The complaint in question put in issue both legal and equitable ownership and becomes res judicata as to both. Plaintiffs can secure relief only by avoiding its consequences or claiming some right under the judgment. They make no claims of any equitable remedy because of constructive or actual fraud, and have neither appealed from nor moved to set aside the judgment.

Plaintiffs seek relief under the judgment by claiming that Edward acquired title to the property as his separate property and was therefore free to make a declaration of trust concerning it. They reason that because the funds Edward gave to Arthur for the purchase of the land came from a joint account of Edward and his wife, Edward was dealing with his separate property. The money was originally community funds earned during the marriage of Caroline and Edward Jacobs, and later placed in a joint account. Plaintiffs contend that when the community funds were placed in the joint account they lost their community character and that real property purchased from the joint account by either became the sole and separate property of the one taking it in his own name. Defendants take the position that community funds placed in a joint account for the convenience of the husband and wife do not lose their community property character unless the result is clearly intended, citing In re Baldwin's Estate, 50 Ariz. 265, 71 P.2d 791 (1937); Evans v. Evans, 79 Ariz. 284, 288 P.2d 775 (1955), as authority.

The evidence is clear that Arthur Jacobs purchased the land with funds earned by Edward Jacobs during his marriage to Caroline Jacobs. Edward testified that he intended to hold the land as community property, and that he considered the funds in the joint account as community funds. Property acquired subsequent to marriage, except through gift, devise or descent, is

presumed to be community property unless shown to be otherwise by clear and satisfactory evidence. Evans v. Evans, supra; A.R.S. § 25–211.

While it appears that the cases cited by defendants are not precisely in point, plaintiffs have offered no authority in support of their proposition and have not commented upon the authorities cited by defendants. We therefore assume that plaintiffs were unable to find any opposing authority to support their proposition. See Silva v. Traver, 63 Ariz. 364, 162 P.2d 615 (1945); DeHeer v. Seattle Post-Intelligencer, 60 Wash.2d 122, 372 P.2d 193 (1962); People v. Paramount Citrus Association, 147 Cal.App.2d 399, 305 P.2d 135 (1957). Unless it should appear without further research that the assignment of error is well taken, we do not feel disposed to consider it. 5 C.J.S. Appeal and Error § 1325, at p. 342; DeHeer v. Seattle Post-Intelligencer, supra. We think that generally the possibility of mischief in such an assumption is much less than might be the case if the court were to go far beyond the research and advocacy of counsel in exploring the many possible facets of the varied propositions submitted for review.

The judgment of the trial court decreed the land to be the community property of Edward and his wife. Plaintiffs have not met their burden to prove otherwise by clear and satisfactory evidence if they wished to show that Edward had the right to enter into a declaration of trust concerning it. Having arrived at the assumption that the land was community property, and there being no evidence that Caroline B. Jacobs had ever assented to an agreement to convey the property to plaintiffs, it follows that Edward Jacobs had no power to encumber the property by the purported trust agreement. A.R.S. § 33–452. Had there been any evidence that Caroline Jacobs had assented to or signed the purported trust agreement, the judgment of the superior court might have been quite different.

Plaintiffs cite Parker v. Gentry, 66 Ariz. 189, 185 P.2d 767 (1947), one of a line of Arizona cases holding that under certain circumstances a married person may hold land in trust and convey it without the joinder of the other spouse in the conveyance. We find no fault with those cases, however, they are not authority for ignoring valid judgments, rules concerning the burden of proof in establishing what is or is not community property, or presumed findings of fact implicit in judgments.

Defendants counterclaimed for loans made in the sum of $800. Plaintiffs in their reply to the counterclaim admitted liability on one loan in the sum of $300, together with interest from the date of the filing of the counterclaim, April 27, 1959, but plaintiffs' reply claimed that the additional loan of $500 was barred by A.R.S. § 12–543 as a debt not evidenced by a contract in writing. This loan was made on August 2, 1954, and was evidenced by a check marked "Loan" which was endorsed by the plaintiff, Arthur Jacobs. At the trial Arthur Jacobs claimed a verbal agreement that both loans were to be repaid from the proceeds of the sale of the "Goat Ranch." The superior court judgment denied defendants any relief on the counterclaim.

We think it obvious that the court was in error in not granting judgment on the $300 loan. The claim was supported by evidence, and the reply to the counterclaim consented that judgment be entered against plaintiffs with interest at six per cent per annum from the time of the filing of the counterclaim. Adams v. Bear, supra. Whether the additional $500 loan was barred by the three year statute of limitations or is governed by the six year statute depends upon whether the debt sued upon is "evidenced by or founded upon a contract in writing." A.R.S. §§ 12–543, subsec. 1 and 12–548. Defendants have supplied the court no authorities on this subject, and we will conclude for the purpose of this opinion that they have none. We note that there are cases on this subject and can only

speculate as to the failure of defendants to present them on their appeal. We feel that if counsel considers a ground for appeal as having merit, they should diligently and fully present the available authority. We do not look kindly upon the practice of the half-hearted presentation of alleged grounds for appeal in the hope that an appellate court will ferret out the law to support them.

Defendants appeal from the denial of attorney's fees and costs. Apparently the original complaint was filed on November 24, 1958. On December 12, 1958, tenders of quitclaim deeds and $5 each were made to the defendants. In their counterclaim filed on April 29, 1959, defendants asked for attorney's fees because of the failure of the plaintiffs to disclaim all right and title adverse to defendants. It is the position of the defendants that the court abused its discretion in failing to grant attorney's fees, and thereby committed reversible error. Plaintiffs argue that the court has absolute discretion in the matter and that the court had the right to deny attorney's fees because of the repudiation of the purported trust agreement by Edward Jacobs. They further argue that defendants, by the filing of their counterclaim, were not and did not tender the deeds and money prior to "bringing the action" as contemplated by A.R.S. § 12–1103, which provides as follows:

"A. If defendant appears and disclaims all right and title adverse to plaintiff, he shall recover his costs.

"B. If a party, twenty days prior to bringing the action to quiet title to real property, requests the person holding an apparent adverse interest or right therein to execute a quit claim deed thereto, and also tenders to him five dollars for execution and delivery of the deed, and if such person refuses or neglects to comply, the filing of a disclaimer of interest or right shall not avoid the costs and the court may allow plaintiff, in addition to the ordinary costs, an attorney's fee to be fixed by the court."

Neither party cites any further authority for his position. We note that there are several cases discussing attorney's fees as costs in quiet title actions, such as McNeil v. Attaway, 87 Ariz. 103, 348 P.2d 301 (1960), and others cited under ☞54 of West Digest Topic "Quieting Title." Whether counsel for either side would wish any of these cases cited as authority for their contentions we do not know, though it seems that a reasonable determination of the issue should include some examination of existing case law of this state or case law of other states which might be persuasive. We feel that further research should be given to the assignment of error concerning attorney's fees to determine if it is well taken and, therefore, do not consider it. DeHeer v. Seattle Post-Intelligencer, supra. In view of our determination that defendants were entitled to recover on their counterclaim for the recovery of the $300 debt, we hold that the court did not abuse its discretion in failing to grant defendants their other costs.

The judgment appealed from is reversed as to the refusal to grant recovery on the claim of $300, but is otherwise affirmed.

NOTE: Judge HERBERT F. KRUCKER having requested that he be relieved from consideration of this matter, Judge ROBERT E. McGHEE was called to sit in his stead and participate in the determination of this decision.

HATHAWAY, Judge (specially concurring).

I concur in the result reached by Judge McGhee. However, since the quiet title judgment of March 17, 1953, is ambiguous as to Edward Jacobs' capacity (whether he was acting as trustee, acting separately or as agent for the community) in bringing the quiet title action, it was essential that the trial judge consider the evidence ad-

duced for resolution of this point. Cosper v. Valley Bank, 28 Ariz. 373, 237 P. 175 (1925); Nelson v. Nelson, 91 Ariz. 215, 370 P.2d 952 (1962).

The trial judge recognized that Edward Jacobs being a married man at the time he received the deed from his brother Arthur and at the time of the quiet title judgment of 1953, the land involved was presumed to be community property. Apparently he was not satisfied that the presumption was overcome. Since there is a substantial conflict in the evidence on this point, the conclusion of the trial judge should not be disturbed on appeal.

MOLLOY, Judge (dissenting).

I regret that I cannot agree with my colleagues as to the proper disposition of this appeal.

Certain additional facts should be stated in order to understand this dissent. Both brothers-litigants testified that the idea of purchasing the four mining claims in question, which the parties referred to as the "Goat Ranch," emanated from the plaintiff Arthur. Though Edward testified that he did not know that the property had been purchased in the name of Arthur until the death of the brothers' father in about 1950, there were introduced in evidence tax records which indicated that during part of the time the property was in Arthur's name, Edward had paid the taxes thereon and received tax receipts showing the title of the property to be in the name of Arthur.

The trust agreement of 1954 is a formal document, signed and acknowledged before a notary public. This agreement is clear and unequivocal. In the recitals it traces the history of the property through its purchase from the state in January of 1946, its being held in trust by Arthur for both brothers, an undivided one-half interest to each, for the period of time from 1946 to 1951, and its transfer to Jacobs in 1951 under an agreement that Edward would hold the property in trust for both brothers, one-half interest in each. The trust agreement provides for the continuance of this trust, with the proviso that when the property is sold, Edward shall first receive out of the sale $1,700 invested by him in the property and the balance to be divided one-half to each brother.

The recitals of the trust agreement are in accordance with the oral testimony given by Arthur at the time of trial. The majority opinion recites that Arthur admitted owing Edward $300 for a loan. Additionally, Arthur admitted owing Edward the $500, also claimed as an indebtedness in the counterclaim. Arthur, however, contended that there was an oral agreement between himself and Edward that these loans would be repaid out of his share of the Goat Ranch, when it was sold. This latter was denied by Edward, who contended that Arthur agreed to pay the loans back as soon as possible after they were made.

Ordinarily, questions of fact are for the judge or jury and not for an appellate court. In the absence of findings of fact, we should assume that all disputed questions of fact were resolved in favor of the judgment reached.

However, in this case we have clear indication of the trial judge's view of the disputes in the evidence. Shortly before the conclusion of the taking of testimony, the court said this:

"If it wasn't for this judgment there wouldn't be anything difficult to decide here. I could say that we—well, kind of traded a mutual property, and this agreement substantiates that and it's a trust property, but here you have got a deed and a judgment divesting this plaintiff of any interest in the property. Now, then, the only question then is of the fact of this Exhibit 1, [the trust agreement of 1954 between the brothers] the agreement."

At the conclusion of all of the evidence, the trial court said:

"Well, the only difficulty I can see about this case the way I look at it right

now, and I am not going to make a final decision now, is if it wasn't for the 1953 judgment, I think the way the parties have dealt with each other plus this * * * this agreement, Exhibit 1, I think perhaps the plaintiff should prevail. But because of the judgment of 1953, which completely quieted the title to this property in the * * * in the defendant, Eddie Jacobs, and the presumption is it's community property. Some question in my mind whether the agreement, Exhibit 1, could be binding if his wife wasn't a party to it. I wish you maybe could write a memorandum or something on that, if you like. *That seems to be the entire case, this community property question which Mr. Dolph raised in his motion.* Now, because of the prior dealings and this agreement, Exhibit 1, I could probably hold that it was a trust and therefore wasn't community property and the wife's signature wasn't necessary, but with this judgment staring me right in the face, which I cannot go behind, where he sued Arthur Jacobs and his wife and quieted title against him, I think this is property * * * now, at least, the presumption that it was community property, and therefore to make Exhibit 1 binding it would require Eddie Jacobs' wife's signature, and that's the way I am looking at the case at this point." (Emphasis added.)

Additional indication of the court's view of the credibility of the witnesses appears in the written minute order directing preparation of formal judgment:

"The Court having taken this matter under advisement, *Court feels that there was no consideration for the agreement of August 9th, 1954 and that as title to the property had previously been quieted in the name of the defendant in this action (in action No. 36425) and that the property now in question is the commun-ity property of defendant and his wife,* it is hereby

"ORDERED that judgment be entered in favor of the defendants and against the plaintiffs, and it is further

"ORDERED that the defendants take nothing on their Counterclaim and that they not be allowed any attorney's fees in connection with this action.

"Counsel for defendants is directed to prepare a formal written judgment.

"IT IS ORDERED that a photocopy of Judgment in Cause No. 36425 Edward C. Jacobs -vs- Rose Jacobs and Arthur W. Jacobs, etc., Pima County Superior Court be FILED IN COURT at this time." (Emphasis added.)

If any further indication is needed of the state of mind of the trial judge on this issue of credibility, we have it in the judgment finding against the defendant on the counterclaim for the two debts of $500 and $300 each. The only logical explanation for finding against Edward as to these indebtednesses is that the court believed Arthur when he testified that Edward and he had agreed that these indebtednesses would be paid out of Arthur's share of Goat Ranch when it was sold.

It thus seems clear that the trial court resolved the conflict in the evidence as to whether there was an oral trust agreement between the parties in favor of the plaintiff. The justness of the majority decision thus rests upon the law of res judicata: Did the quiet title judgment of 1953 effectively preclude the written trust agreement of 1954 from any efficacy?

To the writer of this dissenting opinion, there are cogent reasons why the judgment does not preclude the clear proof of a trust agreement, such as was presented in the case we are considering. These reasons require an understanding of the law of community property as it affects these transactions. A key statutory provision per-

**444**

taining to community real property is A.R. S. section 33–452 reading as follows:

> "§ 33–452. Conveyance of community property
>
> "A conveyance or incumbrance of community property is not valid unless executed and acknowledged *by both husband and wife, * * *.*" (Emphasis added.)

On several occasions our Supreme Court has construed this statute and indicated that a conveyance of real property in which both spouses do not "join" is "void." Rundle v. Winters, 38 Ariz. 239, 250, 298 P. 929, 933 (1931); Cook v. Stevens, 51 Ariz. 467, 472, 77 P.2d 1100, 1102 (1938); Munger v. Boardman, 53 Ariz. 271, 277, 88 P.2d 536, 538 (1939). Our Supreme Court has held that either spouse may convey community property to the other spouse, without a joinder in the conveyance. Schofield v. Gold, 26 Ariz. 296, 304, 225 P. 71, 74, 37 A.L.R. 275 (1924). But this result came about in a rehearing decision, after the contrary had been held in Schofield v. Gold, 25 Ariz. 213, 215 P. 169 (1923).

Our Supreme Court has never held that either spouse alone could convey to a stranger any interest in community property and, by reason of the above, it is apparent that the question is not without inherent uncertainty. From this, it is clear that when Edward obtained a quitclaim deed from his brother in 1951, without the joinder of Arthur's wife, Rose, title was not clear in any titleholder, and the property was, in effect, unmerchantable. When Rose refused to execute the quitclaim deed requested of her by both Arthur and Edward, and if there was an oral trust agreement between Arthur and Edward, then the quiet title action of 1953 was a necessity in order to carry out this trust agreement. The failure of Arthur to respond to the quiet title action in effect forwarded the purposes of the alleged oral trust agreement, and rendered the title merchantable.

The quitclaim deed that was sought from Arthur and Rose in 1951 did not provide for a conveyance to Edward C. Jacobs and Caroline Jacobs, husband and wife, but the named grantee in this unsigned deed was: "Edward C. Jacobs, a married man." Most significant, the quiet title action of 1953 did not quiet title in Edward and wife, but rather in: "Edward C. Jacobs, Plaintiff."

We thus arrive at the principal reason why this quiet title action should not be conclusive of the issues of this case. In Cosper v. Valley Bank, 28 Ariz. 373, 237 P. 175 (1925), our Supreme Court held that a judgment against " * * * Parks individually * * *" (28 Ariz. at 374, 237 P. 175) was not necessarily a judgment against Parks, individually, but would be presumed to be a judgment against both Parks and his wife and that in the absence of proof to the contrary the contention of the plaintiff in this quiet title action that it was an individual judgment should fail. The court expressed this in the following language:

> "It clearly appears from the pleadings and the evidence that the debt, on which the judgment set up is based, was incurred during coverture, and there is not a scintilla of evidence it was anything but a community debt. For the reason that the evidence does not sustain the allegations of the reply, the judgment is affirmed." 28 Ariz. 373, 382, 237 P. 175, 178 (1925).

It is most clear from this decision that, while a judgment against a named male spouse is *presumed* to be a judgment against the community, it is not conclusively so, but the matter is open to inquiry and proof in proper proceedings. The ambivalence in judgments permitted by Cosper v. Valley Bank continues to the present. Nelson v. Nelson, 91 Ariz. 215, 370 P.2d 952 (1962). Merely on the face of the judgment against a man, it is not possible to ascertain conclusively whether the judgment is against an individual or against a community. The writer knows of no reason why the same ambiguity does not apply to a judgment in favor of a man, as in this case. If one can go aliunde the record to

determine whether a judgment against a named male individual is in actuality a judgment against him as an individual or one against the community, then one should be permitted to go aliunde the record to establish that a judgment for a named male plaintiff is not a judgment in favor of the community but is rather one in favor of the individual.

In Rundle v. Winters, 38 Ariz. 239, 250, 298 P. 929, 933 (1931), our Supreme Court held that a wife was an " * * * absolutely necessary * * * " party plaintiff to a quiet title action brought by her husband as to community real estate. This is well-established law in the State of Washington. Lownsdale v. Gray's Harbor Boom Co., 21 Wash. 542, 58 P. 663 (1899) and Parke v. City of Seattle, 8 Wash. 78, 35 P. 594 (1894). The rationale of this law from our sister community property state is that the husband alone should not be able to bring such an action because he would not have authority to compromise it and thus do indirectly what the law does not permit him to do directly, that is, to divest his wife of an interest in community property.

This Washington law appears to be the minority rule among community property states. 42 C.J.S. Husband and Wife § 541, p. 18. The Rundle v. Winters pronouncement, supra, was too much in the nature of dicta to be considered a holding on this interesting question for this state. But the instant case should not cause us to commit ourselves to either the majority or minority view. For, even if the wife is not an indispensable party to a quiet title action as to community realty in this state, fundamental principles of judgment law preclude a judgment in favor of the husband alone from being a binding judgment that the property is community property. The wife not being a party, it is inconceivable that the judgment could be a binding determination that the realty was the separate property of the husband. Conversely, it seems equally clear that the judgment could not be binding as to the community nature of the property. 49 C.J.S. Judgments § 28, p. 68. From this fundamental law, it seems clear to the writer that whatever efficacy the quiet title judgment of 1953 may have had, it did not foreclose the possibility that as of the date of the judgment Edward C. Jacobs had an interest in the subject realty other than as head of the community of himself and wife.

It appears to be the law of this state that either spouse may take property in trust as an individual trustee and that such a trustee may convey back to the cestui without the spouse joining in the conveyance. Parker v. Gentry, 66 Ariz. 189, 195, 185 P.2d 767, 771 (1947). In Parker v. Gentry there was no written trust agreement, but the court held that the oral trust agreement was fully executed when the trustee-wife conveyed back the property to the trustors and that therefore the trust agreement was valid as a fully executed agreement.

In this case, the trust agreement has not been fully executed, but we do have a formal written trust agreement. This eliminates the problem of the statute of frauds, which was encountered in the Parker v. Gentry case. If it be granted that the 1953 quiet title judgment was res judicata that Arthur had no interest in this property, either legally or equitably, as of the time of that judgment, still this does not dispose of this case, *because Arthur's rights in this property arise out of a written trust agreement executed after the judgment.* Even if this were a gratuitous declaration of trust, it would be valid, Restatement (Second), Trusts § 28, to the extent of Edward's interest in the property other than as a member of the community of himself and wife. Clear proof, accepted by the trial court as having verity, shows that the property was held by Edward in his individual capacity as trustee. A peculiarity of community property law is relied upon by appellees to protect what in law amounts to a constructive fraud, MacRae v. MacRae, 37 Ariz. 307, 312, 294 P. 280, 282

(1930). However, as noted above, our community property law has another peculiarity which brings into the law of judgments an ambiguity which under the peculiar facts of this case permits exposition of the inequitable conduct under discussion.

I concur in the principle that litigation should not be protracted and that judgments are entitled to pervasive finality, but I believe the peculiarities of this case permit a showing that the judgment taken was for the purpose of carrying out the trust agreement.

For the reasons stated, it is my opinion that this case should be remanded for a new trial, with the trier of fact not being straitjacketed with the concept that the 1953 judgment requires a finding that the 1954 trust agreement is void.